NATHANIEL M. STONE AND EVA P. STONE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1695–68.    Filed May 6, 1971.

*Robert B. Milgroom* and *George A. Stella*, for the petitioners.
*A. W. Dickinson*, for the respondent.

Simpson, *Judge:* The respondent determined deficiencies in and additions to the income tax of the petitioners as follows:

| Year | Deficiency | Addition sec. 6653(b) [1] |
|---|---|---|
| 1959 | $4,006.69 | $2,003.35 |
| 1960 | 11,888.96 | 5,944.48 |
| 1961 | 13,857.68 | 6,928.84 |

The issues for decision in this case are: (1) Whether the conviction of the petitioner Nathaniel M. Stone for income tax evasion collaterally estops him or the petitioner Eva P. Stone from denying fraud in this case; (2) whether on the facts, without regard to the conviction, the petitioners are liable for the deficiencies and the fraud penalty determined by the respondent; and (3) whether under the provisions recently added to sections 6013 and 6653(b) relating to "innocent" spouses, the petitioner Eva P. Stone is liable for any deficiency or for any fraud penalty. The respondent concedes that the petitioners' tax liability for 1959, 1960, and 1961 is now barred by the statute of limitations if the understatements of income were not due to fraud.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners Dr. Nathaniel M. Stone and Eva P. Stone are husband and wife, who maintained their residence in Brookline, Mass., at the time the petition was filed in this case. For the taxable years 1959, 1960, and 1961, they filed their joint Federal income tax returns, using the cash method of accounting, with the district director of internal revenue, Boston, Mass. Dr. Stone will be referred to as the petitioner.

The petitioner is a physician who has been specializing in diagnosis and treatment by X-ray since 1940. His work involved taking and reading X-ray photos, consulting with other doctors with respect to X-rays of their patients, and testifying as a witness in court on X-ray matters. The petitioner had two offices simultaneously during the years in issue, one in Boston, Mass., and the other in Malden, Mass. Also, he had a financial interest in a firm known as Belmont X-ray Associates (Belmont), which had an office in Belmont, Mass. In addition, he had an arrangement with Emmanuel Cohen, an X-ray technician, doing business as Parkway X-ray Laboratory (Parkway) in Roslindale, Mass. Under this arrangement, Dr. Stone read and diagnosed X-rays taken by Mr. Cohen in return for 40 percent of Mr. Cohen's receipts for such X-rays.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

A substantial part of the petitioner's professional income, possibly the bulk of such income, consisted of payments from Massachusetts Medical Service (MMS), also known as Blue Cross-Blue Shield. He received payments from MMS under four different voucher numbers, each with a different address. The address used in connection with voucher number VO–1010 was the address of the front door of his Boston office; the address used in connection with voucher number MO–2328 was that of the rear door of the same building. Voucher number VO–1076 was listed at the address of Belmont, and voucher number VO–1088 was listed at the petitioner's home address.

Miss Helen Foster, a medical secretary and X-ray technician, was in charge of the secretarial work and the patients' records during the years in issue. She worked in the Boston office. She performed such duties for the petitioner from the time that he purchased the "office" in 1952 until June 1, 1962, leaving his employ immediately before the beginning of the respondent's examination of the income tax returns here in issue.

The records kept in Dr. Stone's office included two record cards for each patient. One such card showed the patient's name, address, age, date of examination, referring physician, area to be X-rayed, and any Blue Shield information. The other record card also included the charge made for each examination and the date of payment. From the latter card, a billing card was made for the purpose of preparing the monthly statements. Also, a daily log was kept, listing patients in order to assign an X-ray number. However, cases involving actual treatment by the petitioner were not assigned numbers.

For each of the petitioner's offices, in Boston and in Malden, a set of books described as "cashbooks" was kept. Miss Foster's testimony described such books as "cashbook number 1" and "cashbook number 2." Cashbook No. 1 contained records of receipts for X-rays and X-ray therapy. Cashbook No. 2 contained records of receipts for consultation fees, for expert testimony, and for the petitioner's treatment of students at the Middlesex School and the Concord Academy. When a fee for a single patient had to be split between the part for X-ray treatment, to be recorded in cashbook No. 1, and the part for consultation services, to be recorded in cashbook No. 2, the petitioner determined the portion of the fee attributable to each type of service. Such allocation was usually indicated on the bill, so that Miss Foster or the girls working under her could usually record the amounts in the proper cashbooks without asking the petitioner each and every time a receipt was recorded. The cashbooks were not marked or labeled in any way which would enable someone examining cashbook No. 1 to know or infer that there was also a cashbook No. 2.

Dr. Stone usually opened the mail in his office. He placed the incoming checks on Miss Foster's desk, and she would make the proper notation on the patients' record cards, and enter the payments in the appropriate cash book or books. At the end of the week, a total was made of the entries in cashbook No. 1 for the Boston office, and such amount was deposited in the petitioner's business checking account in the Somerville National Bank. Such deposits also included such checks from the Malden office as the petitioner brought to the Boston office for that purpose. The petitioner returned to Miss Foster enough checks to equal the amount to be deposited in the Somerville National Bank; the amounts representing the entries in cashbook No. 2 were taken by the petitioner personally and not deposited in the business account. Miss Foster did not know what happened to the checks which were not deposited by her.

The doctor who had preceded the petitioner in his office, and for whom Miss Foster had worked in the same capacity since 1929, did not have two cashbooks. The system of two cashbooks was set up by the petitioner when he took over the office after the death of his predecessor.

The amounts for consultation charges, which were recorded in cashbook No. 2 and were not included in the weekly deposits to the petitioner's business account, were *also* not recorded on the patient's record card which contained information about charges and payments. Miss Foster was concerned about this practice because the items listed in cashbook No. 2 were not reflected on the record cards, and she mentioned to the petitioner that "if in any future time any questions might arise about those entries in the second cash book, * * * I did not wish to be held responsible." Therefore, at her suggestion, the petitioner initialed the list of checks that he took at the end of the week, representing the total of the entries in cashbook No. 2.

Miss Foster did not discuss with the petitioner the amount of his total receipts for the year, nor did she supply him with the amount of such total receipts from the records that she kept.

The petitioners' income tax returns for the years in issue were prepared by the office of a certified public accountant in Boston. The accountant's office did not audit the petitioner's records; the returns were prepared on the basis of information submitted by the petitioner.

In June 1962, the petitioners' tax return for 1960 was assigned to Revenue Agent Michael J. Finley for examination. Agent Finley went to the petitioner and requested to see his books and records; the petitioner referred him to the accounting firm. The accountant showed Agent Finley some canceled checks supporting certain expenses for which the petitioner had taken deductions; the revenue agent said that

he would also have to see the petitioner's books and records. In August 1962, Mr. Finley visited the petitioner's office to make such examination, pursuant to the advice of the accountant. The petitioner showed Mr. Finley a logbook containing voluminous information with respect to patients in both the Boston and Malden offices. Such information included one column which reported the payments made to the petitioner by the patients. The petitioner told Mr. Finley that he added the figures in that column, and used the total of such figures as the basis for preparation of his income tax returns. However, when Mr. Finley added up those figures, he found that they exceeded by approximately $15,000 the amount of receipts reported by the petitioner on his income tax return in that year. At that point, Mr. Finley began an analysis of the petitioner's bank deposits; the petitioner gave him the bank statements with respect to the Somerville National Bank and certain savings accounts. The agent analyzed the bank deposits, taking into consideration certain items which the petitioner advised him should be excluded. Mr. Finley also occasionally looked at the patients' cards while in the petitioner's office. Neither of the cashbooks was seen by Mr. Finley during that examination; he was not told of, and did not know of, their existence.

The information that Mr. Finley gathered from MMS indicated that such organization had paid the petitioner more than his return indicated, and during the initial examination, the petitioner proffered no explanation for this discrepancy, despite Mr. Finley's request for one. As a result of this incongruity, as well as the information that Mr. Finley found in the patients' logs and bank deposit records, he referred the case to the respondent's intelligence division in November 1962. Mr. Finley's initial investigation had at some point been extended to 1961, and the intelligence division subsequently widened the scope of the examination to include 1959 also.

The intelligence division assigned Special Agent Roy W. Lynch to the case; however, Agent Finley continued to work on the case as a cooperating agent. In August 1963, Messrs. Lynch and Finley called upon the petitioner. Mr. Lynch identified himself as a criminal investigator, and advised the petitioner that he did not have to give any information or answer any questions, and that he was free to consult an attorney if he wished. The petitioner stated that he preferred to have an attorney, and Messrs. Lynch and Finley then left the premises.

The petitioner then employed an attorney, James Kendrick, as his counsel, and the latter contacted Mr. Lynch. Mr. Lynch made some outside investigations into the petitioners' sources of income, such as contacts with MMS and with the Legal Services Department, which records the names of doctors who participate in tort cases; and after

such research, he advised Mr. Kendrick that he was ready to see the petitioner's records, if any were to be made available. Mr. Kendrick subsequently made available the petitioner's cashbooks No. 1 for 1961 for both the Boston and Malden offices, bank statements and canceled checks for 1961, and a logbook which Agent Finley did not think was the same book as he had seen before. Cashbooks No. 2, for the Boston and Malden offices, were not produced at all; the petitioner did not disclose their existence to Mr. Lynch.

At a conference in November 1963 in the petitioner's office, at which the petitioner's attorney Kendrick was present, Agents Lynch and Finley were advised by the petitioner for the first time that the petitioner had a business relationship with Mr. Cohen and Parkway.

The petitioner frequently endorsed checks of attorneys, MMS and other insurance companies, and medical insurance reimbursement directly to Mr. Cohen or Parkway. The respondent's agents, in determining the petitioner's income, excluded all such checks. Also, they allowed the petitioner deductions, as business expenses, for any amounts that he paid to Mr. Cohen, who also used the cash method of accounting. However, they did not determine that any other part of the petitioner's receipts or deposits should be allocated to Mr. Cohen.

When the respondent's agents questioned the petitioner about the voucher numbers under which he received payments from MMS, he did not disclose that there were four such numbers; he stated that he had only one, VO–1010. When the agents brought up the subject of the other voucher numbers, which they had learned of without the petitioner's assistance, the petitioner represented that the amounts that he received under one of those numbers, VO–1076, really belonged to Belmont and not to him. Accordingly, in determining the petitioner's income, the respondent's agents excluded all checks received by the petitioner under that voucher number.

The respondent's agents also analyzed cashbooks No. 1 for both the Boston and Malden offices. The petitioner told them that the receipts in such books corresponded to his gross receipts as shown on his tax return. However, the agents had examined every check that MMS had paid to the petitioner during 1959, 1960, and 1961 under all of the different voucher numbers under which he received income, and their analysis showed that many such checks were not recorded at all in his cashbooks No. 1, and others were understated as to amount. Their analysis also revealed that many amounts paid to the petitioner by insurance companies, attorneys, and private patients were similarly understated in, or omitted altogether from, cashbooks No. 1. Also, some entries in the patients' logbook maintained by the petitioner did not correspond to payments known to have been made to the petitioner

by MMS. When the agents confronted the petitioner with samples of the discrepancies that they found, he stated that he knew of no explanation of why the amounts were not properly shown on his book.

Using the bank deposit method to determine the petitioner's receipts, Messrs. Lynch and Finley analyzed 10 banks accounts, including 7 savings accounts and 3 checking accounts. Of the 3 checking accounts, 1 was the petitioner's business account in the Somerville National Bank, 1 was in the names of the petitioner and his mother, and the third was in the name of the petitioner's wife, Eva P. Stone. The savings accounts were all in the petitioner's name, in trust for either Errol Stone or Helaine Stone, or both, except for 1 of the savings accounts which was in the sole name of Errol Stone. Errol Stone and Helaine Stone were the petitioners' dependent children during the years in issue. The agents found that, during those years, the petitioner deposited portions of his professional income in all 10 of the bank accounts.

In their analysis of the petitioner's bank deposits, Messrs. Lynch and Finley eliminated items which, on the advice of the petitioner's attorney or other third parties, appeared to be nonbusiness items, such as transfers, returns of capital from investments, dividend income, or anything else other than business income. The balance they considered to be business deposits.

The results of the analysis of the petitioner's professional income made by Messrs. Lynch and Finley were as follows:

|  | 1959 | 1960 | 1961 |
| --- | --- | --- | --- |
| Gross receipts | $76,133.90 | $95,662.94 | $104,925.45 |
| Gross receipts reported on income tax return | 61,616.71 | 64,828.15 | 72,543.00 |
| Understatement of gross receipts | 14,517.19 | 30,834.79 | 32,382.45 |

According to the respondent's computations, such understatements produced the following discrepancies in taxable income:

|  | 1959 | 1960 | 1961 |
| --- | --- | --- | --- |
| As reported by petitioners | $3,066.60 | $6,924.24 | $10,653.85 |
| As corrected by respondent | 18,058.84 | 37,759.03 | 43,049.44 |

Such discrepancies are allegedly due entirely to the petitioner's failure to report receipts from his medical practice, except for the adjustments made by the respondent to medical expense deductions for 1959 and 1961 to correspond to the changes in adjusted gross income.

In March 1966, a grand jury in Boston indicted the petitioner under section 7201 on three counts of willfully and knowingly attempting

to evade and defeat a large part of his and his wife's Federal income tax liability by filing false and fraudulent income tax returns for 1959, 1960, and 1961. Initially, in April 1966, the petitioner pleaded not guilty. His wife, Eva P. Stone, was not a party to the criminal proceeding.

A jury trial commenced in April 1967 in the U.S. District Court for the District of Massachusetts. During the criminal trial, the petitioner, who had suffered a heart attack in 1960, was examined by three doctors. Two of the doctors filed medical reports with the District Court on April 26, 1967. On that day, the court reviewed the doctor's reports concerning the petitioner's health, and ordered that Government agents be permitted to examine the petitioner's hospital records. The District Court declared a mistrial in May 1967, and the jury was discharged.

After the mistrial was declared, a new trial was scheduled. The new trial was postponed twice on the petitioner's motion. However, the judge denied the petitioner's third request, refusing to allow any further postponements, and shortly thereafter, in October 1967, the petitioner changed his plea to guilty to all three counts. He was sentenced to pay a fine of $10,000 on each count, or a total of $30,000, and was sentenced to 3 months' imprisonment on each count, which sentences were to run concurrently. The petitioner paid the fine and served the sentence. No motion was made to quash the indictment, no appeal was filed from the District Court's judgment, and no steps were taken to set aside that judgment.

OPINION

In this opinion, we must decide: (1) Whether collateral estoppel applies to Dr. Stone or Mrs. Stone, (2) whether on the facts, without regard to the conviction, there is a deficiency and a showing of fraud, and (3) whether the new provisions of sections 6013 and 6653(b) relating to "innocent" spouses are applicable with respect to Mrs. Stone. The respondent conceded at trial that collection of the deficiencies is barred by the statute of limitations if fraud is not shown. Therefore, it is essential for us to determine first whether such a showing has been made.

The respondent has the burden of proving, by clear and convincing evidence, that some part of the understatement of income in each year for which a deficiency has been determined was due to fraud. *Cefalu* v. *Commissioner*, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; *Baumgardner* v. *Commissioner*, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; *Kathleen C. Vannaman*, 54 T.C. 1011, 1017 (1970); *Tsuneo Otsuki*, 53 T.C. 96, 105 (1969). If any part of a deficiency is due to fraud, the 50-percent

penalty is applied to the entire deficiency, not just the part produced by fraud. Sec. 6653(b); *Mauch* v. *Commissioner*, 113 F. 2d 555, 557 (C.A. 3, 1940), affirming 35 B.T.A. 617 (1937); *Arlette Coat Co.*, 14 T.C. 751, 756 (1950). Also, where part of the underpayment of tax in a certain year was due to fraud, there is no statutory time limit on the collection of the deficiency and penalties for that year. Sec. 6501(c); sec. 301.6501 (c)–1, Proced. & Admin. Regs.

In the first instance, the respondent has attempted to establish the existence of fraud by relying on the doctrine of collateral estoppel. Fraud may be established by showing that a taxpayer has been convicted of tax evasion under section 7201 for the year in issue. The convicted taxpayer is collaterally estopped 'from denying the fraud. *Moore* v. *United States*, 360 F. 2d 353 (C.A. 4, 1965), certiorari denied 385 U.S. 1001 (1967); *Tomlinson* v. *Lefkowitz*, 334 F. 2d 262 (C.A. 5, 1964), certiorari denied 379 U.S. 962 (1965); *Henry M. Rodney*, 53 T.C. 287 (1969); *Arctic Ice Cream Co.*, 43 T.C. 68 (1964); *John W. Amos*, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965); *Armstrong* v. *United States*, 354 F. 2d 274 (Ct. Cl. 1965). That the taxpayer's conviction resulted from a plea of guilty to the criminal charges brought against him, rather than from a trial on the merits after a plea of not guilty, does not change the applicable rule. A plea of guilty is a conviction; it is as conclusive as a jury's verdict, and it leaves nothing for the court to do but give the judgment and the sentence. *Kercheval* v. *United States*, 274 U.S. 220, 223, (1927); *Arctic Ice Cream Co.*, *supra* at 75 and authorities there cited.

The petitioner in this case pleaded guilty to three criminal counts of attempted tax evasion, which counts included as essential elements the charges that the joint income tax returns of the petitioner and his wife for 1959, 1960, and 1961 were false and fraudulent. The court imposed a punishment of fine and imprisonment upon the petitioner; he paid the fine and served the time. At no time prior to the present proceeding did he take any action to vacate his plea of guilty, to set aside the conviction, or to charge any impropriety in the procedure employed by the U.S. District Court in which the criminal proceedings were held. However, he now argues that he pleaded guilty not because he believed that he was guilty, and not because he was in fact guilty, but rather because the strain of a criminal trial would have gravely imperiled his health. The petitioner contends that, because of this explanation, the conviction should not now collaterally estop him from denying that the returns for the years in issue were fraudulent.

In addition to his explanation of his own motives, the petitioner has alleged that the judge of the District Court was aware that he was pleading guilty because of his health. Such allegation constitutes a

very serious charge against the District Court. The Supreme Court said in *Kercheval* v. *United States, supra* at 223–224:

Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. When one so pleads he may be held bound. * * * But, on timely application, the court will vacate a plea of guilty shown to have been unfairly obtained or given through ignorance, fear or inadvertence. Such an application does not involve any question of guilt or innocence. * * * The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for any reason the granting of the privilege seems fair and just. [Citations omitted.]

If the petitioner has any bases for believing that he was misled or mistreated by the District Court, we believe that he has an obligation to present that information to the District Court for its consideration. It is significant that he has never attempted to present such allegations to the District Court. He has paid a substantial fine and served a sentence. If he had any bases for securing reconsideration of the judgment of the District Court, it seems that he would have raised them with that court in order to avoid the payment of such fine and the service of such sentence. The fact that he has not presented his objections to the District Court casts considerable doubt upon the weight that we should give to them.

Despite his contention, the petitioner has failed to show by any credible evidence that his guilty plea was wrongfully induced. The petition in this case was amended several times and contains a number of alleged reasons for not applying collateral estoppel. It was alleged that the petitioner was induced to plead guilty because a Government-selected doctor advised him that he would "die" if he went to trial, but at the trial of this case, the petitioner admitted that such allegation in the petition did not accurately reflect the doctor's statement. In the petition, it was also alleged that Special Agent Lynch conspired to cause him to plead guilty, but when the petitioner was asked his basis for such a charge, he could give none. A similar charge of conspiracy was made against the Government-selected doctor, and it was similarly unsubstantiated. In his direct testimony, the petitioner stated that, so far as he knew, the judge was aware that he was pleading guilty because of his illness; but on cross-examination, the petitioner admitted that he never informed the judge of the alleged reason for his plea, nor did anyone else mention the matter to the judge in the petitioner's presence. Hence, the evidence in this case totally fails to establish any impropriety in the conduct of the criminal case.

In support of his argument that collateral estoppel should not be applied, the petitioner relied upon *Kercheval* v. *United States, supra,*

but that case is inapposite. In *Kercheval*, the petitioner's initial guilty plea to a criminal charge had been withdrawn by permission of the District Court, as a result of the accused's allegations that he was induced to plead guilty by the misrepresentations of a prosecuting attorney. A plea of not guilty was substituted. The Supreme Court held that the withdrawn guilty plea was inadmissible as evidence in the trial which followed; it said that the withdrawal of the plea meant that it was to "be held for nought." That such a holding does not support the petitioner in the present case is so clear that it does not require elaboration.

The present case arose in the First Circuit where the Court of Appeals held in *Worcester* v. *Commissioner*, 370 F. 2d 713 (C.A. 1, 1966), vacating and remanding a Memorandum Opinion of this Court, that collateral estoppel was not applicable when a taxpayer convicted of tax evasion was induced by the trial judge by improper pressure not to appeal his conviction. That decision also does not help the petitioner in this case, for there has been no showing that the trial court interfered in any way with the petitioner in his right to appeal or to seek reconsideration of his conviction.

We hold that the conviction of Dr. Stone collaterally estops him from denying that at least a part of the underpayment of tax for the years 1959, 1960, and 1961 was due to fraud, that accordingly he is liable for the fraud penalties on the entire deficiencies for such years, and that as to him, the statute of limitations imposes no bar against the assessment and collection of such deficiencies and penalties. However, the conviction of Dr. Stone does not work a collateral estoppel with respect to Mrs. Stone. This Court has recently held that, when a married couple files a joint return, and the husband is convicted of attempted tax evasion for that year, such conviction does not work a collateral estoppel upon the wife, who was not a party to the criminal proceeding. *Henry M. Rodney*, 53 T.C. 287 (1969); see also *C.B.C. Super Markets, Inc.*, 54 T.C. 882, 894 (1970). The respondent now invites us to reconsider that decision. However, the *Rodney* opinion was subjected to an exhaustive review by this Court, and nothing has occurred in the short space of time since the publication of that opinion (and the opinion in *C.B.C. Super Markets, Inc.*, *supra*, in which we followed *Rodney*) to warrant a reconsideration of such opinion at this time.

It is not necessary to base our decision solely on collateral estoppel. We have before us the evidence from which we can determine as a matter of fact whether there was an underpayment of tax due to fraud.

Although the respondent must show fraud by clear and convincing evidence, it is seldom possible to prove fraud by direct proof of inten-

tion. Generally, the evidence of fraudulent intent must be gleaned by surveying the whole course of conduct of the taxpayer with respect to the transactions in question. Although fraud is never to be imputed or presumed, its proof may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of record. *Tsuneo Otsuki, supra* at 106; *Arlette Coat Co., supra* at 756; *M. Rea Gano,* 19 B.T.A. 518, 532 (1930). Furthermore, we are entitled to consider the entire record to find evidence of fraud, and we are not limited to the respondent's affirmative evidence on that issue. *Frank Imburgia,* 22 T.C. 1002, 1014 (1954); *Wallace H. Petit,* 10 T.C. 1253 (1948); *L. Schepp Co.,* 25 B.T.A. 419, 440 (1932).

The mere existence of the deficiencies in tax liability does not show fraud. *Tsuneo Otsuki, supra* at 106. However, exceedingly large discrepancies between the petitioner's actual net income and the net income reported on the tax returns do constitute evidence supporting fraud, when such discrepancies are unexplained. *Rogers* v. *Commissioner,* 111 F. 2d 987, 989 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938); *Madeline V. Smith,* 32 T.C. 985, 987 (1959); *Abraham Galant,* 26 T.C. 354, 365 (1956); *Eugene Vassallo,* 23 T.C. 656, 663 (1955); *Arlette Coat Co., supra* at 756; *Frank A. Weinstein,* 33 B.T.A. 105, 107 (1935). When the taxpayer tells the respondent's agent that he has only one bank account—and in fact he has several, such conduct also suggests fraud. *Madeline V. Smith, supra* at 987. Fraud is also shown by the taxpayer's evasive conduct in concealing material records from the respondent's agents during the investigation. *Tsuneo Otsuki, supra* at 111. Fraud may be inferred from a taxpayer's keeping of a double set of books and handling his records in a manner that would be likely to mislead or conceal. *Spies* v. *United States,* 317 U.S. 492, 499 (1943); *American Lithofold Corp.,* 55 T.C. 904 (1971).

The respondent determined that the petitioner's gross receipts from the practice of his profession substantially exceeded the amounts reported by him for the years 1959, 1960, and 1961; and such unreported business receipts form the basis for the discrepancies in those years between the amounts of taxable income as reported on the petitioners' joint returns and such amounts as corrected by the respondent. As determined by the respondent, the petitioners' corrected taxable income for 1959 was about 589 percent of that reported on their reurn; for 1960, about 545 percent; and for 1961, about 404 percent. The burden of disproving the deficiencies so determined is upon the petitioners. *W. A. Shaw,* 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958).

Their only attempt to disprove the deficiencies was based on the argument that the respondent's computations failed to give effect

to the fee-sharing arrangement with Mr. Cohen. They argued that Dr. Stone received the payments for the X-rays taken by Parkway and that the computations by the respondent's agents failed to give effect to Dr. Stone's alleged obligation to pay over a portion of such payments to Mr. Cohen. However, Dr. Stone used the cash method of accounting to compute his income, and the respondent's agents, in determining his income, excluded the checks which he actually endorsed to Mr. Cohen and allowed a deduction for all payments which were shown to have been made to Mr. Cohen. Thus, the agents properly took into consideration all payments that were shown to have been made to Mr. Cohen during the years in issue. Furthermore, the petitioner admitted that he was uncertain as to the amount of the money which he allegedly owed Mr. Cohen. The fact that in auditing the petitioners' returns for subsequent years, the agents may have agreed to the use of different methods for computing income has no significance in judging whether the respondent properly determined the petitioners' income for the years in issue—our only question is whether they used proper methods for those years.

In evaluating this argument by the petitioner, it is also relevant to point out that when Dr. Stone and Mr. Cohen had a reckoning of their accounts in 1962, Dr. Stone owed Mr. Cohen only $740, which suggests that the petitioner's claim with respect to 1959, 1960, and 1961 may have been exaggerated, to say the least. Furthermore, if the petitioner's alleged obligation to allocate funds to Mr. Cohen provides the ready explanation of the discrepancies in the petitioner's income, we do not understand why such theory was not offered by the petitioner until over a year after his tax returns came under the respondent's scrutiny; prior to his employment of such theory, the petitioner could give no explanation of the discrepancies, even when specifically questioned. Thus, the petitioners have totally failed to disprove the deficiencies determined by the respondent, and the explanation offered by the petitioner with respect to the allocation of income to Mr. Cohen in no way helps to explain or even colorably justify the petitioner's actions, under the circumstances. Absent a satisfactory explanation, the underpayments of such magnitude, repeated year after year, are strongly indicative of a fraudulent intent. See *Nathan Bilsky*, 31 T.C. 35, 43–44 (1958).

The petitioner's telling the respondent's agents that he received money from MMS under only one voucher number, when in fact he received money under four such numbers, is, we think, analogous to a taxpayer's saying that he has only one bank account when he has several. It is just as indicative of fraudulent intent. The receipts from MMS constituted the bulk of the petitioner's income; he must have

recognized that for the respondent to check his income, the voucher numbers were essential.

At trial, the petitioner alleged that his records were adequate to show accurately his professional receipts. He has not shown that this is so; but even if it were, such records would clearly have to include the books designated as cashbooks No. 2. Yet, the existence of these books was not made known to the respondent's agents at any time during their investigation. No reason is given for the petitioner's failure to disclose such indisputably material records.

The petitioner alleged that he was "sold out" by his attorney, Mr. Kendrick, that there was a conspiracy against him, and that his constitutional rights had been abridged because Mr. Lynch had not advised him properly at the beginning of the investigation. However, none of these allegations has been supported by convincing evidence. The petitioner utterly failed to prove any improper conduct on the part of Mr. Kendrick, and he has shown no evidence indicative of a conspiracy against him. He now admits that during his initial interview, Mr. Lynch advised him "that I had my rights," and advised him that he could obtain counsel before proceeding with the investigation. Also, the petitioner admitted at trial the falsity of his allegation that Mr. Lynch advised him to retain Mr. Kendrick as counsel.

Considering the magnitude and consistency of the petitioner's understatements of income, the absence of any credible explanation for such understatements, his two sets of cashbooks, his concealment of material records and withholding of material facts from the respondent's agents during the investigation, and the inconsistencies between his petition and his testimony, we conclude that the respondent has shown, by clear and convincing evidence, that at least some part of the deficiency in the petitioners' income tax for each of the years in issue was due to fraud. The petitioner's course of conduct was in all material ways the same in each of those years. We also hold that the petitioners have failed to disprove the deficiencies determined by the respondent.

Finally, we consider the question of Mrs. Stone's liability. Although collateral estoppel does not apply to her, Mrs. Stone would have been liable, under the law as it existed prior to January 1971, for both the deficiencies and the fraud penalties for the years in issue, because (1) she signed the joint returns, and (2) the respondent has shown, on the merits of the case, that the petitioner acted fraudulently with respect to these returns, apart from his criminal convictions. The liability would have been imposed on Mrs. Stone even without any evidence of fraudulent intent on her part. *Ginsberg's Estate* v. *Commissioner*, 271 F. 2d 511, 513–514 (C.A. 5, 1959) ; *Katheleen C. Vannaman*, 54 T.C.

1011, 1017–1018 (1970); *Henry M. Rodney*, 53 T.C. 287, 310 (1969); *Tsuneo Otsuki*, 53 T.C. 96, 112–113 (1969), and cases there cited.

However, we must consider the effect of the provisions relating to innocent spouses that were enacted on January 12, 1971. Pub. L. 91–679 (84 Stat. 2063, 1971–1 C. B. 547). Section 6013, relating to joint returns, was amended to add subsection (e), which provides in part:

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return.

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

Section 6653(b), relating to the penalty for fraud, was also amended to add the following new sentence:

In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

These amendments are applicable to this case. Sec. 3, Pub. L. 91–679, *supra.*

Under section 6013(e), Mrs. Stone may be relieved of any liability for the deficiencies in tax and associated penalities, but to be entitled to such relief, she has the burden of proving that she did not know of or have reason to know of the omission from income. We have no evidence as to her knowledge of such omission, and her counsel has made no motion to reopen the trial or to present any such evidence. Accordingly, we must conclude that she has failed to show that she is entitled to any relief under such provision. However, under the amendment of section 6653(b), she is not liable for the penalty for fraud unless it is shown that she was guilty of fraud. The committee report accompanying the enactment of this provision makes clear that the respondent has the burden of showing that she was guilty of fraud. S. Rept. No. 91–1537, 91st Cong., 2d Sess., 1971–1 C.B. 606, 608. Since we have no evidence as to her participation in the fraud, and since the respondent has made no effort to present such evidence, we hold that she is not

liable for the fraud penalty. This new provision merely relieves her of the liability for the fraud penalty—the respondent's proof of fraud by Dr. Stone prevents the running of the statute of limitations so that Mrs. Stone remains liable for the deficiencies for the years in issue. S. Rept. No. 91–1537, *supra* at 82–83.

In conclusion, we hold that both of the petitioners are liable for the deficiencies for 1959, 1960, and 1961, as determined by the respondent; that Dr. Stone is liable for the fraud penalties determined by the respondent; and that Mrs. Stone is not liable for such fraud penalties.

*Decision will be entered under Rule 50.*