LEROY G. AZAR AND DOROTHY M. AZAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Azar v. Commissioner
Docket No. 20609-87
United States Tax Court
T.C. Memo 1990-165; 1990 Tax Ct. Memo LEXIS 186; 59 T.C.M. (CCH) 264; T.C.M. (RIA) 90165; March 28, 1990
B. Gray Gibbs, for the petitioners. Francis C. Mucciolo, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in petitioners' 1979 and 1980 Federal income tax and additions to tax as follows: Additions to Tax, I.R.C. Sec. [1]
Year
Deficiency
6653(b)
1979
$ 90,094
$ 45,047
1980
73,724
36,862
*187 Petitioners concede that substantial understatements of their gross receipts, of their taxable income, and of their Federal income tax liability were reflected on their joint Federal income tax returns for 1979 and 1980. Petitioners, however, dispute the amount of the understatements, and they dispute whether the statute of limitations on assessment remains open. Petitioners also dispute the imposition of the section 6653(b) fraud additions to tax. Petitioners' entitlement to income averaging also is disputed. FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners Leroy G. and Dorothy M. Azar are husband and wife, and they resided in Lehigh Acres, Florida, when they filed their petition. During 1979 and 1980, petitioners were self-employed and were engaged in the business of acquiring and selling parcels of real estate located in southwest Florida. Petitioners originally operated their business as sole proprietors. On November 14, 1980, petitioners *188 incorporated their business under the name of Leroy Azar, Inc. The adjustments in question arise out of petitioners' business activities prior to incorporation of the business. Mr. Azar is a high school graduate. He attended college for two semesters. Prior to starting their own business in 1977, petitioner Leroy G. Azar worked for 12 years for a land development company in Florida, and petitioner Dorothy M. Azar was a high school shorthand and typing teacher. During their adult lives through the years in issue, petitioners employed a tax return preparer to prepare their Federal income tax returns. Petitioners started their real estate sales business in 1977. Through their contacts in the Florida real estate market, petitioners generally would purchase from real estate developers one-half acre parcels of developed or semi-developed real estate and resell the parcels as quickly as possible to people who had recently visited southwestern Florida. Petitioners generally paid $ 1,000 to $ 2,000 for each parcel, always paying cash for the total purchase price, and petitioners then would attempt to resell the parcels for approximately $ 6,000 to $ 8,000. Mr. Azar was primarily *189 responsible for the purchase and sales activities, and Mrs. Azar was primarily responsible for keeping the books. Potential customers were contacted by telephone from Florida. The customer base consisted primarily of people residing in the northern regions of the United States and in Canada who had participated in marketing surveys while vacationing in Florida. Generally, once a month petitioners would travel by car or by airplane to visit people with whom appointments had been made. Petitioners sold parcels of real estate on a cash and installment basis. Petitioners provided the financing on the installment sales. Petitioners' total gross sales in 1979 and 1980 from their real estate sales were as follows: 1979
1980
Cash Sales
$ 120,225
$  60,665
Installment Sales
401,100
604,935
With regard to installment sales, petitioners attempted to obtain cash down payments in amounts sufficient to cover their costs of purchasing the parcels of real estate in order that they could continue purchasing additional parcels. Form agreements-for-deed were used by petitioners as written contracts. Unless otherwise modified, the form agreements-for-deed reflected *190 that down payments on installment sales were made in United States dollars. In some instances involving Canadian residents, however, as a method of offering an incentive to the purchasers, petitioners permitted purchasers to make down payments in Canadian dollars but credited their accounts as if the down payments had been made in United States dollars. Canadian purchasers generally made their monthly installment payments in United States dollars or they sent Canadian dollars in an amount sufficient, after conversion into United States dollars, to satisfy their installment payment obligations. Under the terms of the agreements-for-deed entered into with individuals who purchased real estate from petitioners on the installment payment method, petitioners were to pay local real property taxes due on the properties until the full purchase price was paid off and the deeds to the parcels were transferred to the purchasers, and the purchasers were to reimburse petitioners each year the amount of real property taxes petitioners had paid on the parcels. Beginning in 1977, due to their heavy travel schedule, petitioners employed a Florida bank, First Federal of DeSoto ("First Federal"), *191 to collect payments due on petitioners' installment sales of real estate. Petitioners provided First Federal with the names and addresses of purchasers, the total amount financed on the installment sales, the rates of interest to be paid, and the monthly payments due. First Federal recorded this information in loan files. Petitioners designated their personal savings or checking account at First Federal as the account to which payments collected by First Federal would be credited. First Federal supplied to the purchasers payment coupons and pre-addressed envelopes in which monthly payments were to be mailed to the bank. Payments generally were to be sent to the branch of First Federal located in Lehigh, Florida. Upon receipt of payments, the bank credited petitioners' account with the amount of the payments less a two-dollar service charge per payment, and the bank mailed to petitioners a receipt of each deposit that was made into petitioners' bank account reflecting payments received. First Federal also sent late-payment notices to purchasers who failed to make timely installment payments. An annual loan history for each collection account was maintained by the branch of First *192 Federal located in Arcadia, Florida. As each payment was received, First Federal noted on the loan history the breakdown of principal and interest credited to the purchasers' accounts. At the end of each year, First Federal mailed to petitioners year-end statements for each loan account reflecting all payments received during the year and the remaining principal and interest balances on the accounts. Monthly bank statements pertaining to petitioners' savings and checking accounts at First Federal were mailed to petitioners from the Arcadia branch office. Apparently as a referral fee, petitioners split with other individuals the proceeds relating to a few of petitioners' sales of real estate. First Federal's annual loan-history statements reflected the full amount of the payments received and did not reflect the fact that some of the payments received were to be split between petitioners and certain other individuals. However, where a portion of the payments received was split with others, the deposit receipts First Federal mailed to petitioners reflected only the portion of the payments that First Federal deposited into petitioners' bank account. In 1978, petitioners became *193 dissatisfied with the collection services of First Federal, and they set up a new collection account at Sun Bank, S.W. ("Sun Bank") to which new installment sales contracts were sent in order for Sun Bank to handle the collection services related thereto. First Federal continued to provide collection services on behalf of petitioners in 1978, 1979, and 1980, with respect to installment sales entered into before Sun Bank was hired. Sun Bank maintained a ledger that reflected the names of the purchasers from whom payments were due, the corresponding contract numbers, the beginning balances, the current balances due, payments received, and a breakdown of payments received between principal and interest. Sun Bank charged petitioners two dollars for each payment received. As each payment was received, Sun Bank mailed to petitioners collection receipts reflecting the amount of the payments, the dates received, the portions of the payments allocable to principal and interest, the principal balances, the due dates of the next payments, the two-dollar service charge, and the amount of the payments deposited into petitioners' account at Sun Bank. Sun Bank also provided petitioners with *194 deposit receipts reflecting that the payments, less the two-dollar service charges, were deposited into petitioners' account at Sun Bank. With respect to payments received in 1978, Sun Bank mailed to petitioners at the end of 1978 a Form 1099-Interest, with respect to each installment sale, reflecting only the interest portion of the total payments received on each installment sale. With respect to payments received in 1979 and 1980, Sun Bank discontinued the use of Forms 1099-Interest, and instead mailed to petitioners for each year a Form 1099-Miscellaneous with respect to each installment sale. Each Form 1099-Miscellaneous for 1979 and 1980 also reflected only the interest portion of the payments that Sun Bank received on petitioners' behalf. Petitioners also maintained in their home their own files with regard to all of their sales of real estate. Petitioners' files generally contained the purchasers' names and addresses, the principal amounts financed, the date and the amount of payments received by First Federal and by Sun Bank, the date and the amount of payments mailed directly to petitioners, the portion of the payments received that were allocable to principal and interest, *195 and the principal balances due. Petitioners employed various individuals on a part-time basis to update the files maintained in their home and to send late notices to purchasers who failed to make timely payments. Petitioners trained these employees and reviewed their work. Petitioners did not provide the part-time employees with Forms W-2, Forms 1099, or any other statements of income earned. The part-time employees balanced petitioners' personal checking account, reviewed deposit receipts from First Federal and from Sun Bank, matched the deposit receipts with petitioners' monthly bank statements to verify that the receipts were properly deposited into petitioners' bank account, recorded the payment information reflected by the deposit receipts into the individual files maintained in petitioners' home, recorded in the files the payments that purchasers sometimes mailed directly to petitioners, mailed late notices to purchasers who did not make timely installment payments, and mailed to purchasers notices of the amount of real estate taxes that petitioners had paid on the various properties for which the purchasers were obligated to reimburse petitioners. The files maintained *196 at petitioners' home were not produced at trial. From 1964 through 1981, petitioners employed Irene Lowe to prepare their Federal income tax returns. Ms. Lowe was an accountant and prepared petitioners' returns based on the documents and information provided her by petitioners, and she did not perform audit services for petitioners. In connection with her preparation of the tax returns, petitioners provided Ms. Lowe with the annual loan history statements from First Federal, the Forms 1099-Interest and 1099-Miscellaneous from Sun Bank, and cancelled checks reflecting expenses of the business. It is not clear from the record whether petitioners provided Ms. Lowe with copies of the agreements-for-deed or the bank statements reflecting the deposits of installment payments into petitioners' accounts at First Federal and at Sun Bank. Ms. Lowe was not given the files petitioners maintained in their home regarding their real estate sales. During the years in issue, petitioners did not provide Ms. Lowe with documents or information pertaining to the sales of real estate with respect to which the full purchase price was paid when the transactions were entered into (i.e., the cash sales). *197 Mr. Azar instructed Ms. Lowe to treat income from the sales of real estate as short-term gain taxable as ordinary income. Mr. Azar also informed Ms. Lowe that the down payments petitioners obtained from purchasers approximated petitioners' cost in the real estate sold. Apparently for that reason, Mr. Azar and Ms. Lowe agreed that petitioners' income from the sale of real estate would be reported on the cost-recovery method, under which petitioners and Ms. Lowe understood the down payments would be allocated entirely to petitioners' cost of the parcels of real estate. On Schedule C of petitioners' 1979 and 1980 joint Federal income tax returns, petitioners reported, on the cash basis, the following total gross receipts from their real estate sales business and other income: 1979
1980
Gross Receipts
$ 48,701
$ 38,093
Other Income
2,081 30,947 The total gross receipts reported each year related only to the petitioners' sales of real estate on the installment payment method. No gross receipts were reported on petitioners' 1979 and 1980 Federal income tax returns that related to petitioners' sales of real estate where the purchasers paid the full purchase *198 price in cash at the time the transactions were entered into. With regard to installment sales, generally the total payments received each year with respect to which First Federal was the collection agent were reported as taxable income, allocated between gross taxable receipts associated with the sale of the real estate and interest due on the installment obligations. With regard to the installment sales with respect to which Sun Bank was the collection agent, generally only the portions of the total payments received that represented interest associated with the installment sales of real estate were reported on petitioners' 1979 and 1980 tax returns. The portions of the total payments received in 1979 and 1980 that represented principal due on installment obligations (and that represented taxable profits to petitioners) with respect to which Sun Bank was the collection agent were not reported on petitioners' tax returns. Petitioners' tax returns for 1979 and 1980 claimed deductions in the respective amounts of $ 3,666 and $ 2,588 for real property taxes petitioners paid each year with respect to the parcels of real estate sold on the installment payment method. The reimbursements *199 therefor that petitioners received from purchasers, however, were not reported as income on petitioners' tax returns. Petitioners' 1979 and 1980 tax returns also failed to reflect that petitioners maintained a foreign bank account during each year. Petitioners' 1980 joint Federal income tax return indicated that income averaging was elected but the computation thereof on the return was incorrect. After Ms. Lowe completed the preparation of petitioners' joint Federal income tax returns for 1979 and 1980, Ms. Lowe reviewed the completed returns with petitioners. After reviewing the returns, petitioners signed them, and the returns were mailed to respondent. Respondent began at petitioners' home an audit of petitioners' Federal income tax liabilities for 1979 and 1980. Apparently, friction developed between petitioners and respondent's agent, and respondent's agent agreed to petitioners' request that the audit be continued at Ms. Lowe's office. Petitioners informed respondent's agent during the audit that First Federal and Sun Bank maintained receipts and records with regard to petitioners' real estate sales and that petitioners did not maintain such records. Petitioners did *200 not inform respondent's agent of the files and business records petitioners maintained in their home and that apparently reflected all of their cash and installment sales of real estate in 1979 and 1980. Using information reflected in bank collection records, warranty deeds, and copies of petitioners' agreements-for-deed that respondent acquired from the title company petitioners used in 1979 and 1980, respondent prepared schedules and a summary of petitioners' income and cost-of-goods sold relating to petitioners' real estate sales for 1979 and for that portion of 1980 prior to the incorporation of petitioners' business. Respondent's schedules and summary were admitted into evidence at trial under Federal Rule of Evidence 1006, and they reflect the following computation of petitioners' income from their business and the understatements of income that were reflected on petitioners' returns: 1979
1980
Total Cash Sales
$ 120,225.00
$  60,665.00
Installment Sales
Total Sales
$ 401,100.00
$ 604,935.00
Less: Amount Financed
254,000.00
453,450.00
Down payment Received
147,100.00
151,485.00
Gross Sales $ 267,325.00
$ 212,150.00
Cody Of Sales
111,190.95
121,525.70
Gross Profit
$ 156,134.05
$  90,624.30
Other Income (Deferred
97,406.73
138,524.30
Sales Collections)
Total Income $ 253,540.78 $ 229,148.60
Deductions Per Return
24,417.00
45,620.00
Additional Deductions 30,209.44 35,750.77 Corrected Net Profit
$ 198,914.34
$ 147,777.83 Net Profit Per Return
26,365.00
23,420.00
Understated Net Profit
$ 172,549.34
$ 124,357.83
*201 Respondent determined the amount of the down payments and the dates the down payments were received from the agreements-for-deed, which reflected the amount of the down payments and on which petitioners acknowledged receipt of the down payments. Unless the agreements-for-deed expressly reflected that down payments were made in Canadian dollars, respondent treated the down payments as made in United States dollars. Where an agreement-for-deed reflected that down payments were made in Canadian dollars, respondent treated the down payments as made in United States dollars reduced by the appropriate dollar conversion rate. Where agreements-for-deed were missing or unsigned, respondent used bank collection records, warranty deeds, and a schedule furnished by petitioners to determine the date the sales occurred and the amount of the down payments. Where the only available records of a sale were the bank records and where such records did not indicate that payments were received, respondent did not charge petitioners with additional taxable income. Respondent included the reimbursed real property taxes in petitioners' income. Respondent allowed all of the deductions claimed by petitioners *202 on the Schedule C forms attached to their 1979 and 1980 returns. Subsequent to the audit, petitioners were each charged in the United States District Court for the Middle District of Florida, Tampa Division, on two counts of violating 26 U.S.C. sec. 7201 (1982), in connection with their 1979 and 1980 Federal income tax liabilities, and Mr. Azar was charged with violating 26 U.S.C. sec. 7206(1) (1982), in connection with his 1980 Federal income tax liability. On November 13, 1986, pursuant to a plea agreement, Mr. Azar entered a guilty plea to filing a false 1980 Federal income tax return under 26 U.S.C. sec. 7206(1) (1982). As part of the agreement, the other charges were dismissed. OPINION Adjustments To Income
Although petitioners acknowledge that they underreported their correct taxable income from their real estate sales on their 1979 and 1980 Federal income tax returns, petitioners contend that respondent's computations of their taxable income and of their tax liabilities for both years are inaccurate. Specifically, petitioners argue that respondent's schedules and summary are inaccurate because *203 they include some sales (1) for which complete documentation was not available, (2) for which agreements-for-deed or closing statements were not signed by petitioners and by the purchasers, or (3) for which collection accounts were set up by either First Federal or Sun Bank but with respect to which no payments were received. Petitioners also contend that respondent's computations do not accurately reflect the instances when they were paid in Canadian, not United States dollars, nor the instances where petitioners split some of the income associated with some of the sales with other individuals. As explained, in preparing his schedules and summaries of petitioners' income for their sales of real estate in 1979 and 1980, respondent utilized all relevant and available records and documentation to reconstruct petitioners' income under the specific-item method of proof. Wherever possible, respondent relied on agreements-for-deed to establish purchase prices, amounts of the down payments, and dates the sales and down payments were made. Where respondent was unable to obtain agreements-for-deed from the title company or from bank records, respondent relied on bank collection records, *204 warranty deeds, and a schedule furnished by petitioners to establish sales and payment information. We are not convinced that the agreements-for-deed do not reflect the substance of the agreements entered into by petitioners and the various purchasers who resided in Canada. Petitioners' explanation (that some agreements-for-deed were not modified to accurately reflect the amount of Canadian funds received because the agreements were executed at late hours when petitioners were tired) is not credible. Petitioners argue that the figure used by respondent for petitioners' total 1979 cash sales is inaccurate because it includes income from two sales evidenced by documents executed in December of 1979 even though the parcels were not deeded to the purchasers until January of 1980. The applicable documents, however, indicate that petitioners acknowledged receipt of the stated purchase price in 1979. With regard to petitioners' claim that some of the income from their sales of real estate was split with other individuals, there is insufficient credible evidence to support any adjustments to respondent's computations. We conclude that respondent's schedules and summaries accurately *205 reflect petitioners' taxable income from their real estate sales during the years in issue. We sustain respondent's adjustments to petitioners' sales and income from their real estate sales business. Fraud Additions To Tax
Fraud is neither imputed nor presumed, Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969), and respondent has the burden of proving by clear and convincing evidence that at least a part of the understatement of income for each year was due to fraud with the intent to evade payment of the correct tax liability. Sec. 7454(a); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. a Memorandum Opinion of this Court; Rule 142(b). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941). Fraud may be established by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), *206 affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. at 223-224; Otsuki v. Commissioner, 53 T.C. at 105-106. A pattern of consistent underreporting of substantial amounts of income, especially when accompanied by other circumstances showing an intent to conceal, is strong evidence of fraud. See Holland v. United States, 348 U.S. 121, 137-139 (1954); Vannaman v. Commissioner, 54 T.C. 1011, 1018-1019 (1970); Otsuki v. Commissioner, 53 T.C. at 105-108. Petitioners contend that they hired a qualified tax return preparer to prepare their tax returns, that they relied in good faith on the preparer, that they provided her with the records reflecting all their income, and that the understatements were caused for the most part by mistakes made by the tax return preparer, not by them. Substantial evidence, however, supports respondent's determinations that petitioners had a fraudulent intent in filing incorrect tax returns for the *207 years in issue. There are large discrepancies between petitioners' corrected net profit and the net profit as reported on petitioners' tax returns (discrepancies in excess of $ 100,000 each year). Stone v. Commissioner, 56 T.C. at 224-226. The large discrepancies belie petitioners' claim that they relied on their return preparer to accurately report their income. Clarke v. Commissioner, 22 B.T.A. 314, 328-329 (1931); Amato v. Commissioner, T.C. Memo. 1977-305. During the audit, petitioners did not disclose to respondent's agents the personal files they maintained at their personal residence relating to their real estate sales, and such files were not produced at trial. Korecky v. Commissioner, 781 F.2d at 1569; Stone v. Commissioner, 56 T.C. at 224. Significantly, petitioners did not give to the return preparer and they did not report on their tax returns any income with respect to cash sales made in 1979 and 1980, which resulted in the omission of significant income from their returns. Korecky v. Commissioner, 781 F.2d at 1569; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), *208 affg. a Memorandum Opinion of this Court; Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976). Mr. Azar's guilty plea under 26 U.S.C. sec. 7206(1) for filing a false return provides further evidence of Mr. Azar's fraudulent intent. Wright v. Commissioner, 84 T.C. 636 (1985); Cooper v. Commissioner, T.C. Memo. 1987-303. Primarily for the above reasons, we reject petitioners' claim that they were not responsible for the understatements in tax reflected on their 1979 and 1980 tax returns. The preparer did make some mistakes in the preparation of petitioners' returns, but the evidence establishes that the returns were signed and filed by petitioners with the specific and fraudulent intent to underpay their Federal income tax liabilities. Respondent has established by clear and convincing evidence substantial understatements of taxable income and of tax on petitioners' 1979 and 1980 Federal income tax returns and that the understatements were due to fraud. Sec. 6653(b). In light of our holding as to the additions to tax, respondent's notice of deficiency was timely as to both years in issue. Sec. 6501(c). *209 A further issue is raised as to petitioners' entitlement to use income averaging in the computation of their tax liabilities for 1979 and 1980. Petitioners did not claim income averaging on their 1979 return, and they therefore have the burden of proof on this issue as to 1979. Although incorrectly calculated on their 1980 return, petitioners claimed income averaging on the return. In his notice of deficiency, respondent did not disallow income averaging for 1980, and he raised the issue at trial. As to 1980, therefore, respondent has the burden of proof on this issue. Rule 142(a). Respondent claims that petitioners are not entitled to income averaging for 1979 and 1980 because petitioners have not established their correct taxable income for the base-period years. Sec. 1302(c)(2); Unser v. Commissioner, 59 T.C. 528, 530 (1973). Petitioners note that their tax returns, as filed for the base-period years, were admitted into evidence and that those returns should be regarded as establishing their base-period taxable income for income-averaging purposes. No other evidence as to petitioners' taxable income for 1975, 1976, 1977, and 1978 is before us. We decide *210 the income-averaging issue for each year on the burden of proof. Respondent prevails as to 1979 because petitioners, for that year, have the burden of proof as to their correct taxable income for the applicable base-period years, and because petitioners have offered no evidence other than their tax returns as filed and their self-serving testimony. Petitioners prevail on the income-averaging issue as to 1980 because, as explained, for that year respondent has the burden of proof as to petitioners' correct taxable income for the applicable base-period years (1976, 1977, 1978, and 1979) and no evidence has been offered with respect to the first three years of the base period (1976, 1977, and 1978) except petitioners' returns as filed and petitioners' testimony. With respect to 1979 (the last year of the base period applicable to the income-averaging computation for 1980), we have established herein petitioners' corrected taxable income. Accordingly, due to respondent's burden of proof, for 1980 income-averaging purposes, the base-period income is established by the 1976, 1977, and 1978 returns as filed and by our determination of petitioners' corrected income for 1979. On the record *211 before us, petitioners are not entitled to use income averaging for 1979, but they are entitled to use income averaging for 1980, if the computation of petitioners' averagable income for 1980 meets the statutory requirements. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩