JAMES R. WALSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walsh v. Commissioner
Docket No. 7411-73.
United States Tax Court
T.C. Memo 1977-392; 1977 Tax Ct. Memo LEXIS 49; 36 T.C.M. (CCH) 1587; T.C.M. (RIA) 770392; November 14, 1977; as amended, Filed Pipp Marshall Boyls and Peter R. Stromer, for the *50 petitioner. Fredrick B. Strothman, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions to tax in petitioner's Federal income tax: Year
Deficiency
Sec. 6653(b) [1]
Sec. 6654
1963
$269,063.45
$134,531.73
$7,533.76
1964
17,357.89
8,678.95
486.02
1966
2,455.44
1,227.72
57.38
1967
9,301.70
4,650.85
297.66
The issues for decision are: (1) Whether $365,000 under the management and control of petitioner during 1963 and 1964 was misappropriated and converted by him for his personal benefit and is therefore taxable income to him; (2) Whether the payment to petitioner of $1,000 in 1966 by J. Alton Lauren is taxable income to him; (3) Whether payments during 1966 and 1967 by the Sargent Foundation to or on behalf of petitioner are taxable income to him; (4) Whether payments during 1966 and 1967 by Americans Building Constitutionally to or on behalf of petitioner are taxable income to him; (5) Whether the fraud penalty *51 provided by section 6653(b) is applicable for 1963, 1964, 1966 and 1967; and (6) Whether the addition to tax pursuant to section 6654 for failure to pay estimated tax is applicable for 1963, 1964, 1966 and 1967. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time he filed his petition, petitioner was a resident of Aurora, Colorado. Petitioner is in the "educational business," instructing laymen in techniques to "conserve assets." Petitioner is knowledgeable in the law in general and tax law in particular. In 1947 petitioner created the National Committee on Alcoholism and transferred the "rights" to all his services to that Committee. Subsequently, in 1964 he formed the Walsh Family Estate, a Trust, to carry on the work of the National Committee on Alcoholism and transferred his "intellectual property" to the trust. Petitioner, his wife and his mother were the trustees of the Walsh Family Estate. The primary beneficiary of the Walsh Family Estate was the Walsh Family Foundation. Neither the Walsh Family Estate nor the Walsh Family Foundation was a qualified tax exempt organization pursuant to section 501(c). 1. One *52 Prospect Corporation.
Petitioner was employed as general manager of the Boxwood properties ("Boxwood") from approximately March 1963 until January or February 1964. Boxwood consisted of some 23 to 25 structures which were composed of four, six or eight townhouses apiece. There was a total of 163 units, 159 of which were rentable. Four of the units were to be converted into a community recreation center and a large swimming pool was to be constructed adjacent to this center. Boxwood was owned by One Prospect Corporation ("Prospect which was formed for the purpose of managing Boxwood. Prospect acquired Boxwood by taking over the existing mortgage and then refinancing the loan. Prospect had, as a result of the refinancing, a surplus of $358,000. This surplus was placed in an escrow account for the furnishing and operation of Boxwood as well as completion of the recreation center. Legal title to Boxwood was held by a land trust of which the sole beneficiaries were the principals of Prospect. Petitioner was neither an officer nor director of Prospect and he owned no equity in either prospect or Boxwood. [2]
*53 As general manager of Boxwood, petitioner promoted the concept behind the project, namely, obtaining young, single (often transient) tenants for furnished apartments. His other duties included: preparing apartments for occupancy, securing tenants, collecting rents, paying bills, hiring and firing employees. In sum, he had complete control over the management of Boxwood. During the period that petitioner was general manager of Boxwood, many of its expenses, particularly utility bills, were not paid, and some furniture was misappropriated. In addition, a check on Prospect's account, dated August 4, 1963, in the amount of $500 was made payable to a law firm which represented petitioner in a lawsuit. [3] This lawsuit did not involve Prospect in any manner whatsoever. Petitioner never accounted to Prospect or any of its principals for any of the monies that were under his management and control, despite demands for such accountings. Petitioner's position as general manager was terminated in early 1964 at the direction of Prospect's vice-president. After petitioner was terminated as general manager, *54 no records concerning the income or expenses of Boxwood were found. Since petitioner left behind no records, the principals of Prospect had to reconstruct the income and expenses for the period during which petitioner was general manager. An accountant was employed for this purpose. The accountant's audit revealed the disappearance of rental income in the amount of $100,000, construction loans in the amount of $140,000, and other conversions of monies and personal property in the amount of $125,000, for a total of $365,000, during the period that petitioner was manager of Boxwood. Petitioner had these monies under his management and control while he was manager of Boxwood. In 1964 a complaint was filed in the Circuit Court of Cook County against petitioner and others by the principals of Prospect for misappropriation and conversion of corporate funds. A summons was served on petitioner on October 31, 1964, and he filed an answer to the complaint. However, neither petitioner nor his attorney appeared at the trial, and a default judgment in the amount of $365,000 was entered against petitioner and the other defendants. [4] The amount of the judgment was based upon the accountant's *55 audit and the testimony of Prospect's vicepresident. Of this $365,000, $140,000 (the construction loans) was misappropriated by one of petitioner's co-defendants in the lawsuit. No part of the remaining $225,000 ($365,000 less $140,000) was used for the benefit of Prospect nor was any part of the $225,000 either a loan or a gift to petitioner. None of the $225,000 has been repaid to Prospect, its officers and shareholders or Boxwood. Of this $225,000 under petitioner's management and control, 8/9 ($200,000) is allocable to 1963 and 1/9 ($25,000) is allocable to 1964. *56 2. J. Alton Lauren
Petitioner received a $1,000 check from J. Alton Lauren dated February 18, 1966, as a finder's fee for referring an appraisal to Mr. Lauren. 3. Sargent Foundation
Petitioner met Dr. Harold Lee Sargent in 1965 at a meeting where petitioner stated he had an "idea" that could possibly be of benefit to Dr. Sargent and several of his colleagues and other professional people. The "idea" was that under constitutional law there were provisions whereby Dr. Sargent and others could conserve and preserve their funds. Petitioner talked in terms of tax savings through the creation of a not-for-profit corporation (foundation) to which an individual could transfer his assets and the contract for his services. [5] On the basis of petitioner's advice, Dr. Sargent established the Sargent Foundation. There were no contractual arrangements between Dr. Sargent or the Sargent Foundation and petitioner, or between Dr. Sargent or the Sargent Foundation and the Walsh Family Estate or the Walsh Family Foundation. [6] However, petitioner *57 devoted a considerable amount of time to the activities of the Sargent Foundation. The Sargent Foundation's activities consisted of spreading the "idea" of using not-for-profit corporations to save taxes. Presentations of the "idea" were made to groups of individuals, and if an individual actually employed the "idea" a fee of $1,750 was charged. During 1966 approximately $65,000 was collected by the Sargent Foundation through these activities. Presentations of the Sargent Foundation's "idea" were made by petitioner and Dr. Sargent. Expenses incurred by either individual in connection with these presentations were paid by the Sargent Foundation. However, petitioner was not an employee of the Sargent Foundation, and he did not receive a salary for his services. Dr. Sargent signed on behalf of the Sargent Foundation *58 the following checks payable to petitioner during 1966: Date
Amount
1/21/66
$ 350
1/22/66
650
3/17/66
1,100
4/23/66
1,000
6/14/66
1,000
9/14/66
500
$ 4,600 The following checks, written to cash, were signed by Dr. Sargent on behalf of the Sargent Foundation and cashed by Mrs. Walsh, who acted as a courier for petitioner; Mrs. Walsh was not an employee of either Dr. Sargent or the Sargent Foundation: Date
Amount
7/24/66
$ 640
7/25/66
350
8/ 2/66
250
8/ 2/66
300
8/18/66
500
8/31/66
350
9/30/66
500
$2,890
On June 30, 1966, Dr. Sargent signed on behalf of the Sargent Foundation a check payable to cash in the amount of $400. Petitioner received $200 when this check was cashed. On September 14, 1966, Dr. Sargent signed on behalf of the Sargent Foundation a check payable to the Walsh Family Estate in the amount of $1,500. Neither Dr. Sargent nor the Sargent Foundation had any business dealings with the Walsh Family Estate. Dr. Sargent paid the Walsh Family Estate at petitioner's direction. The total of the above payments from the Sargent Foundation to petitioner during 1966 is $9,190, which petitioner had under *59 his management and control in 1966. Petitioner never gave Dr. Sargent or the Sargent Foundation an accounting for these monies, although such an accounting was requested. No part of this amount was used to pay expenses of the Sargent Foundation. In addition, none of these monies was ever returned to the Sargent Foundation by petitioner, nor were these monies intended to be either gifts or loans to petitioner. 4. Americans Building Constitutionally
In 1965 petitioner met Mr. Robert Hayes. Mr. Hayes and petitioner together established Americans Building Constitutionally ("ABC"). The purpose of ABC was, like the Sargent Foundation, to spread the "idea" of saving taxes through the usage of tax-exempt, not-for-profit corporations or foundations. Petitioner was not an employee of ABC. However, he acted as a consultant to ABC in 1966 and 1967. Pursuant to his advice, ABC did not seek a determination letter regarding its tax-exempt status from the Internal Revenue Service. Petitioner was provided office space by ABC, and several young attorneys at ABC were selected by him to work under his direction and control. Petitioner's activities as a consultant to ABC during the *60 years in question took up most of his time during this period. During 1966 and 1967 petitioner had under his management and control the following amounts: Date
Amount
Payee
9/13/66
$1,000
Saul Gaynes
11/11/66
1,500
Walsh Family Estate
$2,500
1/6/67
5,000
Cash
Foundation
3/1/67
2,500
James Walsh and
Saul Gaynes
3/1/67
1,500
Walsh Family Estate
4/10/67
2,000
Walsh Family Estate
5/5/67
3,000
Walsh Family Estate
6/5/67
2,000
Walsh Family Estate
6/21/67
3,000
Cash
6/30/67
3,000
Walsh Family Estate
7/24/67
1,000
Sofietti and Johnson
9/5/67
1,500
Walsh Family Estate
9/11/67
2,600
John B. M. Goetz, Jr.
12/1/67
1,500
Walsh Family
Foundation
12/1/67
1,500
Clarice R. McWilliams
$31,600
Neither the Walsh Family Estate nor the Walsh Family Foundation had any contractual arrangement with ABC. Petitioner asked Mr. Hayes that any compensation due him be paid to the Walsh Family Estate or the Walsh Family Foundation. There was no reason other than to compensate petitioner that ABC would have paid either the Walsh Family Estate or the Walsh Family Foundation. The check to Soffietti and Johnson was posted *61 on ABC's ledger under the caption "legal fees." Mr. Hayes did not engage the services of Soffietti and Johnson, and the law firm did no work on behalf of ABC. Rather, Soffietti and Johnson performed legal services for petitioner personally. All of the above-listed checks were written pursuant to the directions of petitioner and were for his benefit. None of these payments was for expenses on behalf of ABC, nor were these monies loans or gifts by ABC to petitioner. During 1967 petitioner occupied Apartment 5-F at the Fontana Shores Condominiums in Fontana, Wisconsin. He was not required by ABC to live in that apartment. Title to the apartment was in ABC, which paid the mortgage on the apartment and its upkeep and maintenance costs. The realtor in charge of the Fontana Shores thought that petitioner was the owner of the apartment and that ABC was "his" corporation. The apartment sold for $39,000 in 1967, and the fair rental value of the apartment on an annual basis was $5,025. In the fall of 1966, petitioner was questioned about ABC by a revenue agent. Petitioner told the agent that ABC was exempt and that a Form 990 had been filed; neither statement was true. Subsequently, *62 in 1971, this same agent was assigned to investigate petitioner. At a meeting in March of 1971, petitioner appeared but refused to produce any records. Petitioner did not file Federal income tax returns for the years in issue, nor has he ever filed Federal tax returns or paid any Federal income tax. In 1969 petitioner was convicted in California of conspiracy to commit grand theft by false pretenses; he is also under injunction in Colorado to refrain from employing deceptive business practices. In his statutory notice respondent determined deficiencies and additions to tax for the years in issue as set forth at the outset of this opinion. ULTIMATE FINDINGS OF FACT Petitioner was knowledgeable in tax law and knew of his obligation to file income tax returns. Petitioner received income for the years in issue as follows: Source
1963
1964
1966
1967
Prospect
$200,000
25,000
$ 0
$ 0
J. Alton Lauren
1,000
Sargent Foundation
9,190
ABC
2,500
32,125
$200,000
$25,000
$12,690
$32,125 [7]/
*63 Petitioner failed to file income tax returns for the years in issue and failed to pay any portion of his income tax liability for those years, and refused to produce records of his income or expenditures for the Internal Revenue Service. OPINION The first issue is whether petitioner received unreported taxable income during the years in question. Respondent's determination is presumptively correct. Petitioner, on whom the burden of proof rests ( Welch v. Helvering,290 U.S. 111 (1933), Rule 142, Tax Court Rules of Practice and Procedure), has failed to carry his burden in this case. 1. Funds Misappropriated From One Prospect Corporation
Respondent determined that $365,000 misappropriated from One Prospect Corporation ("Prospect"), which was under the management and control of petitioner, was taxable income to him during 1963 and 1964. Prospect owned Boxwood, a housing development outside Chicago. During the years in question, petitioner was general manager of the Boxwood project; petitioner's duties covered complete management of the project, including the collection of rent, payment of bills, hiring and firing of employees, and furthering the *64 success of the project. Prospect had obtained $358,000 by refinancing the mortgages on the condominiums, which funds were placed in an escrow account for the purpose of furnishing the condominiums and completing a recreation center. In addition, during the time that petitioner was general manager of Boxwood approximately $100,000 in rent was collected. When petitioner was terminated as general manager of Boxwood in early 1964, an audit of the project revealed that $365,000 was missing. This sum included $100,000 rental income, $140,000 from escrow set aside for construction, and $125,000 of other monies and property. In order to audit Boxwood, the owners had to reconstruct its income since petitioner left no records of either the income or expenses of the project. Prospect and the principals thereof subsequently sued petitioner and others for misappropriation and conversion of these funds and obtained a default judgment for $365,000.Respondent relied on this default judgment in determining petitioner's deficiencies for 1963 and 1964. At trial petitioner made several assertions denying that he had ever misappropriated funds. Petitioner claimed (a) that he had paid all the *65 bills with the rental income and some of the loan proceeds, (b) that he had used the loan proceeds to purchase furniture which was subsequently converted by other individuals, and (c) that the $140,000 from escrow had been misappropriated by another individual. With the exception of the last assertion, we find no evidence to support petitioner's claims. Petitioner relied at trial only on his own testimony; he had no records for the years in question. However, petitioner was not a credible witness. He gave vague, inconsistent and evasive answers throughout the trial. Moreover, petitioner has recently been convicted in California of conspiracy to commit grand theft by false pretenses. The sole witness on his behalf, a Chicago attorney, was similarly not a credible witness, especially in light of his recent disciplinary suspension from the practice of law. At trial respondent's witnesses and petitioner did agree that another individual had misappropriated $140,000 from the escrow funds set aside for construction. Although the parties stipulated before trial that these monies had been under petitioner's management and control during the years in question, we find that petitioner *66 did not misappropriate or convert the $140,000.Petitioner has carried his burden of proof as to this amount, and respondent's determination of the deficiency must be reduced accordingly. As to the remaining $225,000 ($365,000 less $140,000) it is unclear whether petitioner alone misappropriated all these funds, especially since petitioner was only one of several defendants against whom a default judgment was entered for these monies. However, petitioner failed to carry his burden of proving that he did not misappropriate monies which he conceded were under his management and control. Since respondent's determination was not arbitrary or capricious (cf. Helvering v. Taylor,293 U.S. 507 (1935)), we must sustain the remainder of respondent's determination. Accordingly, we find that petitioner had taxable income of $200,000 in 1963 and $25,000 in 1964. 2. J. Alton Lauren
Petitioner received a $1,000 check from J. Alton Lauren in 1966. The parties have stipulated that this check was a finder's fee for referring an appraisal to Mr. Lauren and represents taxable *67 income to petitioner. Accordingly, respondent's determination of a deficiency as to this income is sustained. 3. Sargent Foundation
Petitioner admits having received $9,190 from the Sargent Foundation during 1966, but disputes respondent's determination that these monies were taxable income to him. Petitioner argues that these monies were used to pay expenses of the Sargent Foundation. Respondent has determined that $9,190 received by petitioner in 1966 was compensation to him. During 1966 petitioner worked for or on behalf of the Sargent Foundation, which was established by Dr. Harold Lee Sargent on petitioner's recommendation in order to spread the "idea" of using foundations to lower taxes. Petitioner was not an employee of the Sargent Foundation, and he received no regular salary therefrom. Petitioner has failed to produce records verifying his assertion that the $9,190 he received from the Sargent Foundation was used on behalf of the Sargent Foundation. He refused to account for his expenditures to Dr. Sargent during the years in question. In the absence of records we have only his unsupported testimony as evidence, and we do not find petitioner to be a credible *68 witness. [8] Since petitioner has produced no credible proof, respondent's determination must be sustained. 4. Americans Building Constitutionally
Petitioner admits that he had under his management and control $2,500 for 1966 and $32,125 for 1967 received from ABC, but he disputes respondent's determination that these monies were taxable income to him. Petitioner argues, to the contrary, that these monies were used to pay expenses of ABC. ABC was formed in 1966 by Mr. Robert Hayes at the advice of petitioner. The purpose of ABC was to promote the "idea" of saving taxes through the use of not-for-profit foundations. During 1966 and 1967 petitioner spent a considerable amount of his time working on behalf of ABC promoting the "idea." Although ABC provided him with an office, he was not an employee of ABC and did not receive any salary.During 1966 ABC paid to petitioner *69 or on his behalf $2,500, and during 1967 $30,100. 8a Respondent has determined that these monies were compensation to petitioner. Petitioner failed to produce any records establishing that the monies received by him or on his behalf were expenses of ABC. He asserted that none of the monies received from ABC were spent on his own behalf, but we have found that one check in the amount of $500 was paid to a law firm which performed legal services for petitioner personally and not for ABC. In the absence of records we have only petitioner's unsupported testimony, and we do not find him to be a credible witness. Petitioner did not challenge respondent's assertion that the apartment which he occupied in Fontana Shores, Wisconsin, was paid for by ABC and that petitioner was not required to live in the apartment as a condition of his employment. Accordingly, respondent's determination that $2,025 for the rental value of the apartment (which was considerably less than the fair market rental value of $5,025) was compensation to petitioner is sustained. Since petitioner has presented no credible evidence contrary to respondent's determinations, *70 respondent's determination is sustained. 5. Section 6653(b) Addition to Tax (Fraud Penalty)
The next issue is whether petitioner is liable for the fraud penalty under section 6653(b). Section 6653(b) provides that if any part of an underpayment of tax is due to fraud, an addition to tax equal to 50 percent of the total underpayment may be imposed. Respondent has determined such additions to tax for each of the years in question. Respondent has the burden of proving that all or part of petitioner's underpayment for each year in issue was due to fraud (section 7454(a)). Fraud must be proved by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent must establish fraud for each individual year in issue. Stone v. Commissioner,56 T.C. 213, 220 (1971). For fraud to be present, we must find that petitioner acted with the specific intent to evade a tax believed to be owing. Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). The *71 issue of fraud poses a factual question which is to be decided upon an examination of all the evidence in the record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent may meet his burden of proof through circumstantial evidence. Powell v. Granquist,252 F. 2d 56, 61 (9th Cir. 1958). Well-established indicia of fraud provide benchmarks for weighing petitioner's conduct. See Tooke v. Commissioner, 1977 P-H Memo. T.C. par. 77,091 (1977). See also H. Balter, Tax Fraud and Evasion, sec. 8, p. 54 (3d ed. 1963). In this case respondent has met his burden of proving fraud by clear and convincing evidence on the record as a whole, and for three of the years in question respondent has established specific instances of petitioner's fraudulent conduct. On the basis of the following indicia of fraud we sustain respondent's fraud penalty: Failure to file. Petitioner either received compensation or misappropriated funds from Prospect, J. Alton Lauren, the Sargent Foundation and ABC during the years in question but failed to file income tax returns for each of these years. In fact, petitioner has never filed an income *72 tax return. He is a knowledgeable businessman and knew of the filing requirements. Petitioner claimed at trial that he had never filed Federal income tax returns since he believed that he was within the ambit of the "Nun's Exception." [9] During the years in question, section 170 provided that charitable deductions are not subject to a percentage limitation if during the taxable year and in each of 8 out of the 10 preceding years a taxpayer's charitable contributions plus income taxes exceed 90 percent of his taxable income. Petitioner's contention that he did not have to file a return is without merit for two reasons: (1) This exception allows increased charitable deductions but does not excuse an individual from filing a return; and (2) petitioner's "contributions" were to the Walsh Family Estate or the Walsh Family Foundation, neither of which was organized and operated exclusively for charitable purposes or had sought to obtain an exemption ruling. On the basis of petitioner's background, we find that petitioner knew that he had no valid or reasonable excuse for his failure to file Federal income tax returns for the years in issue. Such *73 continuous, willful failure to file is not conclusive evidence of fraud, but it is one of the facts which is indicative that an underpayment of tax is due to fraud. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), on appeal (8th Cir., May 23, 1977); Beaver v. Commissioner, 55 T.C. 85, 93 (1970). Failure to produce records. Petitioner failed to produce any records for the years in issue. Petitioner claimed that all his records had been destoryed in a plane crash in 1973; we find this contention incredible. Although failure to produce records is not conclusive evidence of fraud, such behavior is a further indication of petitioner's fraudulent intent. See Webb v. Commissioner, 394 F. 2d 366, 379-380 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Causing monies to be paid to third parties. Petitioner had his compensation paid to third parties during 1966 and 1967. This action also indicates *74 petitioner's intent to fraudulently avoid payment of taxes. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), on appeal (8th Cir., May 23, 1977). Petitioner's background. One relevant factor in an inquiry into fraud is petitioner's legal and business background. According to the testimony of several witnesses, petitioner was knowledgeable about income tax laws and presented himself as a promoter in tax-related ventures. Petitioner claimed to have attended law school and spent much of his life studying tax law. In light of this background, petitioner's failure to report taxable income is an additional indicium of fraud. Irolla v. United States, 390 F. 2d 951, 954 (Ct. Cl. 1968). See Beaver v. Commissioner, 55 T.C. 85, 93 (1970).
Credibility. We have found petitioner to be almost completely lacking in credibility. His testimony was vague and contradictory. His petition to this Court claimed that the monies from Prospect were a loan to him, but at trial petitioner denied ever receiving any of the monies. In addition, petitioner has recently been convicted of conspiracy to commit grand theft by false pretenses in *75 California and is under injunction in Colorado to refrain from false and deceptive business practices. Petitioner's sole witness on his behalf was also not credible. The lack of petitioner's credibility does not establish fraud, but leads us to discount his explanation of his business affairs for the years in question. In addition to these indicia of fraud, we have the following specific instances of petitioner's fraudulent failure to report taxable income: Use of Prospect funds to pay petitioner's law firm. On August 4, 1963, Prospect paid the amount of $200 to a law firm for petitioner's personal benefit. The law firm had no relationship, business or otherwise, with Prospect but was defending petitioner personally.Payment of petitioner's expenses by Prospect was clearly compensation to him, Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), which he failed to report without justification. Payment from J. Alton Lauren. On February 18, 1966, J. Alton Lauren paid petitioner $1,000 as a finder's fee for petitioner's services. He failed to report this compensation, which was clearly taxable income to him. We find this failure to report *76 taxable income to be fraudulent. Payment of petitioner's lawyers by ABC. On July 24, 1967, ABC paid a law firm $1,000. This payment was on behalf of petitioner personally; ABC had no dealings, business or otherwise, with the law firm. This payment constituted compensation to petitioner, which he fraudulently failed to report.
In light of these specific instances of petitioner's fraudulent failure to report income, as well as the other general indicia of fraud for all the years in question, we hold that respondent has shown by clear and convincing evidence that petitioner is liable for additions to tax for fraud under section 6653(b) for each of the years in issue. 6. Section 6654 Addition to Tax
The final issue for decision is whether petitioner is liable for an addition to tax due to underpayment of estimated income taxet pursuant to section 6654. Petitioner agreed that he paid no income taxes during the years in issue, and we have determined that petitioner had taxable income during those years. The addition to tax is mandatory if respondent can establish underpayment *77 of estimated tax, Estate of Roe v. Commissioner, 36 T.C. 939, 952 (1961), and respondent has established such underpayment in this case. Accordingly, an addition to tax pursuant to section 6654 is applicable for the underpayments of tax by petitioner in 1963, 1964, 1966 and 1967. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Petitioner asserted at trial that he, Mr. Buchanan and Mr. Stanaszek were the true owners of Boxwood, and that Mr. Debes and Drs. Pfeiffer and Dommers were merely nominees seeking tax shelters. As proof of this contention, petitioner introduced a quit-claim deed signed by Dr. Pfeiffer. However, the testimony of Mr. Debes and Dr. Pfeiffer contradicts petitioner, and we find the former witnesses to be more credible. In any event, the actual ownership of Boxwood is immaterial to the issues in this case.↩
3. McEwen v. Walsh,↩ Nineteenth Judicial Circuit (Ill.), General No. 76305.
4. Civil Action 64 CH 6077↩. Petitioner claims his default was due to the death of his trial counsel and threats received against his life should he prosecute the case. The reliability of the default judgment is relevant because respondent admits that the deficiency determination was based upon the default judgment. We find it difficult to believe, however, that petitioner and his regular (as opposed to trial) attorney would allow a default judgment of this magnitude to be entered without a contest, if petitioner had any evidence to support his present assertions of lack of misconduct. Furthermore, petitioner failed at trial to produce any evidence (other than the fact that one of his co-defendants misappropriated $140,000 of the total amount) which is contrary to the default judgment.
5. Apparently, petitioner believed that usage of foundations would minimize taxes since the individual would have no direct income.↩
6. Dr. Sargent stated there was no contractual arrangement between the various foundations; petitioner stated that the Walsh Family Estate contracted to sell Mr. Walsh's services to the Sargent Foundation. We find the former's testimony more persuasive, especially since there was only one check from the Sargent Foundation to the Walsh Family Estate during 1966.↩
7. /↩ We have determined that petitioner received $36,625 ($31,600 received plus $5,025 rental value of the apartment) from ABC during 1967. The parties stipulated that petitioner had $32,125 ($30,100 received plus $2,025 rental value) under his management and control for 1967, and this figure was also the basis of the deficiency determined by respondent. For purposes of this opinion, we adopt the stipulated figure.
8. Dr. Sargent stated that possibly some of these monies were for petitioner's expenses on behalf of the Sargent Foundation. Dr. Sargent was not certain, however, of the extent of such expenses. Since petitioner failed to verify any expenses whatsoever, we must sustain respondent's determination.↩
8a. See footnote 7 supra↩.
9. Apparently petitioner was referring to section 170(b)(1)(C).↩