GEORGE MARKOVSKY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Markovsky v. Commissioner
Docket No. 27758-82.
United States Tax Court
T.C. Memo 1985-283; 1985 Tax Ct. Memo LEXIS 346; 50 T.C.M. (CCH) 120; T.C.M. (RIA) 85283; June 13, 1985. *346 Petitioner earned income from a variety of sources for each of the years in issue. He understood his obligations to pay income taxes and to file income tax returns. He failed to cooperate with respondent in developing information as to his income tax liability. By amended answer, respondent asserted that, in 1976, petitioner sold his investment in the corporation that produced most of his income. Held: (1) Addition to tax under section 6653(b), I.R.C. 1954 (fraud), is imposed for each of the years in issue. (2) Petitioner's motion to suppress evidence is denied. Respondent carried his burden of proof as to the additional income for 1976. George Markovsky, pro se. Richard S. Bloom, for the respondent. CHABOT MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under sections 6653(b)[1] *347 (fraud) and 6654(a) (underpayment of estimated tax) as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1973
$9,926.02
$4,963.01
$223.33
1974
11,610.03
5,805.02
277.97
1975
13,875.94
6,937.97
407.59
1976
[2] 17,401.41
8,700.71
558.37 By amendment to answer, pursuant to section 6214(a), respondent asserts for 1976 an increased deficiency and increased additions to tax under sections 6653(b) and 6654(a) in the amounts of $28,333.07, $14,166.53 and $1,054.67, respectively. As a result, the total 1976 deficiencies and additions to tax under sections 6653(b) and 6654(a) would be in the amounts of $45,734.48, $22,867.24, and $1,613.04, respectively. [3] At trial, the Court granted respondent's motion to dismiss, under Rule 123(b), [4] *348 as to the deficiencies and the additions to tax under section 6654(a) in the amounts determined in the notice of deficiency. These are the issues as to which petitioner has the burden of proof. As a result of the foregoing developments, the issues for decision are as follows: [5]
(1) Whether petitioner is liable for an addition to tax under section 6653(b) for each of the years in issue; and (2) Whether petitioner is required to recognize for 1976 a long-term capital gain on the sale of his interest in G & W Distributing Co, Inc. FINDINGS OF FACT Some of the facts have been deemed stipulated; [6] *349 the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner resided in Youngstown, Ohio. Petitioner filed Federal income tax returns jointly with his wife, for 1970, 1971, and 1972. On each of these tax returns, he showed his occupation as "Corp. Officer".On each of these tax returns, he reported income from his salaries from G & W Distributing Co., Inc. (hereinafter sometimes referred to as "Distributing"), and (for 1970 and 1971) from G & W Realty, Inc. On each of these tax returns, he reported dividend income to himself from four or five payors and interest income from one or three payors. On each of these tax returns, he reported capital gains r losses (from a total of 14 sales during the three years). On his 1970 tax returns, he reported a Schedule C loss from a car wash, income from a pension, income from a partnership, and losses from two other partnerships. On his 1971 tax return, he reported income from a pension, income from a partnership, and losses from two other partnerships. On his 1972 tax return, he reported income from two partnerships (one of which is G & W Realty Company, hereinafter sometimes referred to as "Realty") and *350 losses from two other partnerships. On his 1970, 1971, and 1972 tax returns, he reported adjusted gross income, income tax liability, and income tax withheld in the amounts shown in table 1. Table 1 Adjusted Gross
Income Tax
Income Tax
Year
Income
Liability
Withheld
1970
$31,634.08
$5,876.60
$8,597.00
1971
33,278.97
7,520.80
5,668.70
1972
41,137.89
10,294.55
7,141.00
Petitioner's 1970, 1971 and 1972 tax returns were prepared by George M. Kolman (hereinafter sometimes referred to as "Kolman"). Kolman began preparing tax returns for petitioner in 1962. Kolman did not prepare any tax returns for petitioner after 1972. Kolman approached petitioner during the filing season for 1973 tax returns and told petitioner that he should file his 1973 tax return. Petitioner responded that Kolman should not worry about the matter, that petitioner would take care of it. Petitioner did not file Federal income tax returns for any of the years 1973, 1974, 1975, and 1976. During the period from 1973 through 1976, petitioner was vice-president, a 50-percent owner, and an employee of Distributing. Petitioner received dividends from Distributing in 1973, 1974, and 1975 in the amounts of $525, $525, and $1,050, respectively. *351 Petitioner received wages from Distributing in 1973, 1974, 1975, and 1976 in the amounts of $15,400, $18,650, $20,550, and $13,000, respectively. [7] In addition to these wages, in 1976 petitioner received $2,750 from Distributing for services petitioner performed for Distributing. Petitioner received interest from Distributing in 1973, 1974, 1975, and 1976 in the amounts of $175, $252, $750.75, and $427.80, respectively. In 1976, petitioner received a distribution from the profit-sharing plan of Distributing in the amount of $9,739.04; this plan was noncontributory (i.e., petitioner made no contributions to this plan). All of the Forms W-2 and Forms 1099 showing the foregoing payments by Distributing to petitioner were either handed to petitioner or mailed to him. Petitioner received payments from Republic Steel Comany's pension plan in 1973, 1974, 1975, and 1976 in the amounts of $2,130, $2,130, $2,307.50, and $2,556, respectively. During the period from 1973 through 1976, petitioner was a 50-percent partner in Realty. *352 Realty's ordinary income, reflected on its partnership information tax returns for 1973, 1974, 1975, and 1976, was $26,809.91, $26,029.58, $29,188.72, and $35,059.88, respectively. The Schedule K-1 setting forth petitioner's share of Realty's income for each of these years was given to petitioner after the partnership information tax return was prepared. In 1973, petitioner was a 33-1/3 percent partner in Walter George John Markovsky (hereinafter sometimes referred to as "WGJ"). WGJ's ordinary income, as reflected on its partnership information tax return for 1973, was $194.46. The Schedule K-1 setting forth petitioner's share of WGJ's income was given to petitioner after the partnership information tax return was prepared. On April 14, 1975, petitioner and his wife conveyed their residence to Universal Life Church, Inc. In December 1976, petitioner's interest in Distributing was bought from petitioner by Walter Markovsky for $190,000. Petitioner's basis in this interest was $30,000. In July and August 1973, petitioner and his wife purchased from Western Silver Exchange a total of eight "lots" of gold coins for an aggregate of $13,880. The cash down-payments on these purchases *353 aggregate $4,930. In February and June 1973, petitioner and his wife purchased through Pacific Coast Coin Exchange a total of 45 "Bags" or "Lots" of silver coins for an aggregate of 78,720. The deposits received by the exchange aggregate $17,765. During each of the years 1973, 1974, 1975, and 1976, petitioner traded in various commodities through Merrill Lynch, Pierce, Fenner & Smith, Inc.
In or about November 1975, June R. Jewell (hereinafter sometimes referred to as "Jewell"), a revenue agent, began to examine into petitioner's income tax liabilities for 1973 and thereafter. Petitioner refused to discuss his tax liabilities with Jewell over the telephone; he demanded that Jewell's questions be in writing. He directed that any request for information be sent to his "representative", Lucille E. Moran (hereinafter sometimes referred to as "Moran"). Jewell did not send any request to Moran because respondent's files did not include any power of attorney for Moran on petitioner's behalf. On August 18, 1976, Jewell handed an administrative summons (see secs. 7602 and 7603) to petitioner, requiring production of petitioner's records pertaining to his tax liabilities for 1973, 1974, *354 and 1975. Respondent dis not receive anything from petitioner in response to this summons, but Jewell did receive a letter from Moran. This letter, dated September 7, 1976, stated in part as follows: Be now advised and informed as follows: Ms. Jewell's pocket "Summons" specifically requests above-named Associates [i.e., petitioner and his wife] to abjure their First and Fifth Amendment Immunities by meeting with her on September 9, 1976 for the purpose of answering questions and providing information and documentary evidence for Holy Office types to use against them. Mr. and Mrs. Markovsky are not members of the Mormon Church. Hence they are under no threat of being excommunicated from the Celestial jurisdiction by the Hierarchy of that or any other church for exercising their First Amendment Religio/Political Freedoms to be (Tax) Protesters (or "Protestants" if you will, the terms are interchangeable because they mean the same things). And, of course, the statute of limitations expired 200 years ago on the sorry idea that secular servants had "authority" to undress (excommunicate) incifiduals of their Civil Rights and Liberties and thereafter imprison them for the Heresy of being *355 protesters or dissenters to the status quo. First Amendment Injunction took care of such arrogances. The Markovsky's take the position that because 1040's, W-4E's, W-4's, and other Income Tax forms are Confessions, which are enforced by Inquisitorial procedures that you and yours are engaged in the UNAUTHORIZED PRACTICE OF (Catholic) CHURCH LAW. You and yours seem to have forgotten -- or never knew -- that formal Confession to an entrenched priestly class has, from time immemorial, been the controlling Sacrament of Catholic Religions; that it was the compulsions surrounding the Liturgy of Confession which Martin Luther rejected, ab initio, over 400 years ago by his Priesthood of all Believers principle, thereby precipitating the PROTESTANT (Protester) Reformation; and that this same Self-Priesthood principle is the precedent underlying Separation of church and State and other First Amendment Injunctions. The Markovsky's have no objection to Priests and other Clergymen practicing the liturgy of Confession within the privacy of their religious associations. That's known as Freedom of Religion! But they REFUSE to permit persons living off public payrolls to practice their ignorance *356 of First Amendment Injunctionson them, as if they were subjects of a Church/State Theocracy, instead of Sovereign citizens of a Republic founded on the individual's Self-Priesthood. Moreover they reject the pretension that when the First Amendment demoted Priests and other Clergymen to private citizens thereby enjoining Official use of the implements of religious psychology to promote Political Orthodoxy on this side of the Atlantic -- that it somehow transferred their erstwhile sacerdotal License, intact, to Secular Servants of these United States. On February 14, 1978, petitioner sent a letter to respondent's District Director for Cleveland, Ohio, maintaining his "strong conviction and firm belief that I am not subject to, nor liable for any income tax, nor have I been in the past." On October 3, 1980, petitioner was indicted for willfully failing to file Federal income tax returns for 1973, 1974, 1975, and 1976, in violation of section 7203. On January 19, 1981, petitioner pleaded guilty as to 1975 and 1976. On March 12, 1981, the United States orally moved to dismiss the charges as to 1973 and 1974; this motion was granted; petitioner was convicted as to 1975 and 1976; for *357 each of the two offenses petitioner was sentenced to one year imprisonment and a $10,000 fine; execution of sentence was suspended and petitioner was placed on probation for two years, on condition that, within six months, (1) petitioner pay the aggregate $20,000 fine and (2) "become current in his filings with the Internal Revenue Service". On October 14, 1981, petitioner was found to be a probation violator, the probation was revoked, and he was commanded to begin serving his sentence. * * * For each of the years 1973, 1974, 1975, and 1976, petitioner had an underpayment of income tax required to be shown on his tax return; some part of this underpayment for each such year was due to fraud. In 1976, petitioner had a gain of $160,000 on the sale of his interest in Distributing. OPINION I. Fraud
Respondent contends that petitioner knew he had a legal obligation to file income tax returns and pay income taxes, and that petitioner deliberately failed to comply with these known obligations in order to evade the payment of his income tax liabilities. Petitioner contends that the income tax is voluntary. We agree with respondent. When respondent seeks to imposes the addition to tax *358 under section 6653(b), [8] he bears the burden of proving by clear and convincing evidence that petitioner has an underpayment, and that some part of this underpayment is due to fraud. Section 7454(a)[9] *359 ; Rule 142(b); e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1968). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court [10]; Mensik v. Commissioner,328 F.2d 147 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court [11]; Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence. Powell v. Granqist, 252 at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion, 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). Respondent need not prove the precise amount of underpayment *360 resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d at 303; Kreps v. Commissioner,351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660 (1964). In carrying his burden, respondent has not relied on petitioner's failure to meet his burden of proving error in respondent's determinations as to the deficiencies (e.g., Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982), and cases there cited). Rather, respondent presented persuasive evidence as to petitioner's income from a variety of sources. This income is more than sufficient to result in a deficiency for each year. Accordingly, we conclude (and we have found) that respondent has carried his burden of proving, by clear and convincing evidence, that for each of the years 1973, 1974, 1975, and 1976, petitioner had an underpayment of income tax required to be shown on his tax return. In determining whether any part of each of these underpayments is due to fraud, we note the following: (1) Petitioner understood his obligation to file tax returns and to pay income taxes, as shown by his *361 filing of tax returns and his paying of income taxes for 1970, 1971, and 1972, when his income was similar to that for the years in issue. (2) Petitioner failed to file income tax returns for each of the years in issue. We do not credit petitioner's statement that he thought the income tax was voluntary. We note that he failed to file returns even to claim refunds of the relatively small amounts of income taxes that had been withheld. Also, by petitionerhs own admission (the guilty plea to the sec. 7203[12] indictment), this failure to file tax returns was criminally willful as to 1975 and 1976. (3) Petitioner failed to cooperate with respondent in developing information as to his income tax liability. Although he chose to take his case to this Court, he failed to cooperate with this Court in developing such information. (See n. 6, supra.) In contrast to the situation in Muste v. Commissioner,35 T.C. 913, 920-921 (1961), petitioner made no attempt to disclose the situation in order to present a test case or otherwise to vindicate his view of the law. (4) The nature of petitioner's business activities and the variety of his investments convince us that petitioner's action with *362 regard to his tax liabilities were purposeful, and not inadvertent. We conclude (and we have found) that some part of petitioner's underpayment for each of the years in issue was due to fraud. See Rowlee v. Commissioner,80 T.C. 1111, 1123-1126 (1983); Habersham-Bey v. Commissioner,78 T.C. at 312-314. As to petitioner's arguments, see generally McCoy v. Commissioner,696 F.2d 1234 (CA9 1983), affg. 76 T.C. 1027 (1981); Rowlee v. Commissioner,supra. *363 We hold for respondent on this issue. II. 1976 Sale
Respondent contends that petitioner must recognize a $160,000 long-term capital gain for 1976, on account of petitioner's sale of his interest in Distributing. [13] Because this was asserted by amendment to answer and not determined in the notice of deficiency, respondent bears the burden of proof. Reiff v. Commissioner,77 T.C. 1169, 1173 (1981), Rule 142(a). As a preliminary matter, we deal with a motion by petitioner that was taken under advisement. At trial, the Court received from petitioner a "Motion to Dismiss". The gravamen of the motion appeals to be petition's contention that, with regard to the 1976 sale of petitioner's interest in Distributing, respondent obtained information (grand jury materials) in violation of Rule 6(e), Fed. R. Crim. P. (hereinafter sometimes referred to as "Rule 6(e)"). The Court *364 filed the motion as a "Motion to Suppress Evidence." [14]
It appears that the grand jury proceedings petitioner refers to are those which resulted in his indictment on October 3, 1980, for willfully failing to file income tax returns for the years in issue in the instant case. The first of the exhibits that petitioner attached to his motion is a transcript of testimony given by Walter Markovsky to two of respondent's special agents on September 7, 1977, in relation to petitioner's income tax liabilities for the years in issue in the instant case. Petitioner directed the Court to those portions of the transcript which show that respondent already had in hand the $190,000 check used by Walter Markovsky to purchase petitioner's interest in Distributing. It is evident that respondent knew about the sale, and the sale price, more than three years before the grand jury handed down its indictment. [15] Nothing in the materials attached *365 by petitioner to his motion, and nothing in any other part of the record in the instant case, suggests that respondent obtained any grand jury materials on this issue, whether or not in violation of Rule 6(e). Under the circumstances, petitioner's motion to suppress evidence is denied. On the merits, it is clear from the evidence in the record that petitioner sold his interest in Distributing in December 1976 for $190,000, that his basis was $30,000, and that he had a gain of $160,000. We have so found. We hold for respondent on this issue. In light of respondent's concession as to petitioner's basis for his interest in Distributing (see n. 3, supra), Decision will be enteredunder Rule 155.
Footnotes
1. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue. 2. Of this amount, self-employment tax under chapter 2 is $173.80; the remaining amount is chapter 1 income tax.↩
3. Respondent's claim for a 1976 increased deficiency and increased additions to tax is based on his assertion that petitioner was required to recognize for 1976 a long-term capital gain of $165,000. On brief, respondent concedes that the amount of this gain is only $160,000.↩
4. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.
5. In his petition, petitioner asserts the bar of the statute of limitations. Respondent deals with this matter in his opening brief. Petitioner does not refer to this matter in his answering brief, and so we assume that he has conceded it. In any event, the statute of limitations is not a bar for any of the years in issue because of our finding that petitioner did not file a tax return for any of these years (sec. 6501(c)(3)) and also because of our holding as to fraud for each of these years (sec. 6501(c)(1)).↩
6. As a result of an order of the Court under Rule 91(f), certain proposed stipulations were deemed stipulated and proposed exhibits were received into evidence.
7. From these wages, the following amounts were withheld as income taxes: $2,350.14, $2,329.20, $3,548.80, and $1,939.60, for 1973, 1974, 1975, and 1976, respectively.↩
8. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * [The subsequent amendment of this provision by section 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, does not affect the instant case.] ↩
9. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect to such issue shall be upon the Secretary or his delegate. [The subsequent amendment of this provision by section 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant case.]
10. T.C. Memo. 1970-274↩.
11. T.C. Memo. 1966-81↩.
12. Section 7203 provides, in relevant part, as follows: SEC. 7203. WILLFUL FAILURE TO FILE RETURN, SUPPLY INFORMATION, OR PAY TAX. Any person * * * required by this title or by regulations made under authority thereof to make a return * * * who willfully fails to * * * make such return, * * * at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution. [The subsequent amendment of this provision by section 329(b) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 618, does not affect the instant case.]↩
13. Section 61(a) provides, in relevant part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (3) Gains derived from dealings in property;↩
14. See Graham v. Commissioner,82 T.C. 299 (1984), on appeal (CA3, May 22, 1984), in which we held that even if respondent used grand jury materials in violation of Rule 6(e)↩ in preparing a notice of deficiency, such use would not invalidate the notice od deficiency.
15. The notice of deficiency was mailed about two years after the indictment, and five years after Walter Markovsky's testimony. We do not have any explanation as to why respondent failed to deal with this matter in the notice of deficiency.↩