JAMES W. Mc LEOD, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mc LEOD v. COMMISSIONER
Docket Nos. 5275-85, 40182-85.
United States Tax Court
T.C. Memo 1986-395; 1986 Tax Ct. Memo LEXIS 213; 52 T.C.M. (CCH) 254; August 25, 1986. Joseph H. Blackwell, for the petitioner. [1]
Frank R. DeSantis (trial only) and Craig S. Morford, for the respondent. WILLIAMS
MEMORANDUM OPINION WILLIAMS, Judge: In these consolidated cases, the Commissioner determined deficiencies in petitioner's Federal income tax and additions to tax pursuant to section 6653(b) [2] for the taxable years 1974, 1975, 1976 and 1977 as follows: Docket No.
Year
Deficiency
Additions to Tax
5275-85
1974
$4,480.66
$2,240.33
1975
5,649.82
2,824.91
1976
41,350.54
20,675.27
40182-85
1977
16,269.57
8,134.78
*214 This Court must decide: (1) whether petitioner failed to report income for the taxable years 1974, 1975, 1976 and 1977; and if so, (2) whether any part of the underpayment of tax for each of the taxable years 1974, 1975, 1976 and 1977 was due to fraud with intent to avoid Federal income tax within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, James W. McLeod, resided at Cleveland Heights, Ohio at the time the petitions in these cases were filed. Petitioner was born on June 21, 1935 in Alabama. Petitioner's mother, Dessie Washington (Dessie), and brother, James L. McLeod (J.L.), currently reside in Ozark, Alabama. Petitioner moved to Cleveland, Ohio in 1951 and was employed by the National Casting Company as a laborer until 1957, at which time he was drafted into the Army. Petitioner was honorably discharged in 1959, and he returned to his former job at the National Casting Company in Cleveland. Petitioner was periodically laid off by the National *215 Casting Company, during which periods he was generally employed by the Empire Plow Company. Petitioner claims to have saved between $7,000.00 and $8,000.00 in cash from his earnings while in the armed services. These savings were not deposited in a bank. In 1960 petitioner filed for bankruptcy to protect himself from creditors holding notes petitioner had cosigned prior to entering the Army. Petitioner did not report the $7,000.00 or $8,000.00 in cash savings either to the attorney preparing his bankruptcy petition or to the Federal court in which he filed his bankruptcy petition. From 1964 through and including 1977 petitioner was employed by the Fisher Body Division of the General Motors Corporation (Fisher Body), in Cleveland. Petitioner's yearly earnings from his employment at Fisher Body were as follows: Taxes and
Credit Union
Year
Gross Earnings
Other Deductions
Deductions
1964
$1,722.53
$216.26
1965
6,568.87
896.84
1966
5,535.79
1,023.35
1967
5,798.40
1,247.41
1,250.00
1968
8,216.35
1,938.81
2,350.00
1969
5,873.25
1,666.75
1,850.00
1970
5,507.49
1,381.01
1,550.00
1971
11,210.70
2,511.56
2,400.00
1972
10,300.46
2,587.11
2,350.00
1973
12,058.52
3,282.54
2,450.00
1974
2,486.41
528.94
150.00
1975
5,424.14
1,827.78
1,400.00
1976
8,028.01
2,113.86
1,750.00
1977
12,633.67
*
*
Totals:
$101,361.59
$21,222.22
$17,500.00
*216 Commencing in 1955 petitioner served as the custodian for a building owned by Emil Bruh and Stanley Bruh, father and son, located at 1696 East 79th Street in Cleveland. For his services petitioner was provided a rent-free first-floor apartment in the building. The building contained eight apartments and four single rooms, none of which was vacant for more than one week at a time. The single rooms were rented for $44.00 per month. Petitioner's basic duties as custodian were to collect rents and to maintain the building. Petitioner forwarded to the building's owners a check for the rent collected. Petitioner was indicted on March 31, 1981 and charged with violating section 7201 [3] for the taxable years 1974, 1975, 1976 and 1977. Petitioner pleaded guilty to Count II of the indictment pursuant to a plea agreement under which the remaining Counts against petitioner were dismissed. Count II charged petitioner with violating section 7201 for the taxable year 1975. *217 During the years before the Court, petitioner acquired certain assets in the name of nominees. Petitioner purchased a 1976 Chevrolet van in October of 1976. The van was purchased in the names of Charles King and Van Sales. These individuals subsequently transferred their interest in the vehicle to petitioner, for which they received no consideration. Petitioner himself paid the entire purchase price, $9,522.00, in cash. In 1977 petitioner also acquired real estate at 1655 East 79th Street for $9,000.00 cash in the name of Charles King, though Charles King did not contribute any of his own funds to the acquisition of the property. On April 20, 1977, petitioner purchased a 1977 Thunderbird for $7,030.41. Petitioner paid the full amount for the automobile in cash, which was acquired in the name of Linda Shipman, petitioner's daughter. Petitioner also gave substantial gifts to his relatives. In 1974 petitioner bought a 1974 LTD, paying cash, which he gave to his mother. In 1975 petitioner gave his mother $11,000.00 cash, $3,950.00 of which was used for a down payment on a new home. In 1976 petitioner gave his mother $6,300.00 to build a swimming pool at her new home and $15,000 *218 to purchase a dry cleaners. In 1977 petitioner purchased two 1977 Ford LTD's for a total of $12,425.80 paying cash. One car was purchased for his mother, Dessie Washington, and the other for his stepfather, Ben Keys. Petitioner's brother, J.L., delivered the cars to Alabama a short time after they were purchased by petitioner. On April 1, 1976 petitioner purchased a house at 3665 Brinkmore Road in Cleveland. The cost of the house was $48,000.00, for which petitioner paid $30,000.00 in cash and financed the remaining $18,000.00. In connection with this transaction a Form 4789, Currency Transaction Report, was filed with respondent on April 8, 1976, noting a deposit to escrow account of $29,455.00. Throughout the years at issue in these cases petitioner maintained no books or records. Petitioner's income tax returns for the years 1970 through 1977 report gross income in the following amounts: Taxable Year
Gross Income
1970
$5,947.00
1971
11,211.00
1972
10,300.00
1973
***
1974
2,504.10
1975
5,424.14
1976
8,116.00
1977
14,626.44
Respondent determined that petitioner had assets and liabilities, for the years *219 indicated, in the following amounts: Assets
12/31/73
12/31/74
12/31/75
12/31/76
12/31/77
Cash in bank
$ 2,025.15
$ 8,737.29
$ 5,399.47
$ 9,350.56
$ 10,499.71
Receivable -- refund
due from over-
payment on Cadillac
4,000.00
Receivable --
Frieda McLeod
45.00
45.00
Real Estate --
1655 E. 79th St.
9,000.00
Real Estate --
3665 Brinkmore
48,455.00
48,455.00
Carpeting and
appliances
8,661.82
13,093.83
Furniture and
Furnishings
22,728.65
29,113.08
Prepaid Interest
3,913.96
3,304.00
2,694.04
Automobiles
21,862.63
20,679.00
22,463.50
15,034.00
15,034.00
Total assets
$27,801.74
$32,720.29
$34,557.01
$104,275.03
$125,240.62
Liabilities: Accum. Deprec. --
1655 E. 79th
St. Residence
$ 600.00
Notes and mortgage
payable: Local
45 Credit Union
2,985.39
1,750.61
4,180.98
Cleveland Federal
17,936.28
17,758.25
Central National Bank
1,424.34
35.85
35.85
35.85
35.85
Society National Bank
14,626.15
12,346.75
10,067.35
Total liabilities
$19,035.88
$14,133.21
$14,284.18
$17,972.13
$18,394.10
Net worth
$ 8,765.86
$18,587.08
$20,272.83
$86,302.90
$106,846.52
*220 Respondent determined that petitioner owned the following automobiles during the years indicated: Automobiles:
1973
1974
1975
1976
1977
1974 Cadillac
$ 7,280.00
$ 7,280.00
1974 Honda
299.00
1975 Honda
598.50
598.50
598.50
1976 Chevrolet
Van
9,027.00
9,027.00
1972 Ford Pinto
2,582.63
1976 Cadillac
8,765.00
1973 Champion
Motor Home
12,000.00
12,000.00
12,000.00
1972 Corvette
5,408.50
5,408.50
1971 Pontiac
Station Wagon
1,100.00
1,100.00
Automobiles
$21,862.63
$20,679.00
$22,463.50
$15,034.00
$15,034.00
Respondent determined that petitioner expended the following for personal living expenses during the years indicated: Personal living expenses
1974
1975
1976
1977
Recreation, entertainment,
vacations
$ 114.00
$ 135.00
$ 100.00
Bank service charge
12.85
16.85
14.80
Bank Americard payments
2,163.30
Utilities
123.62
405.23
282.21
1,200.85
May Company insurance
254.44
Miscellaneous
1,219.19
594.79
699.51
Auto insurance and dues
227.00
487.00
531.73
885.46
Motor home insurance
174.75
165.25
Auto repairs
210.00
356.94
390.86
FICA
65.79
313.74
469.64
739.07
Federal Income Taxes
369.65
739.33
1,157.00
2,029.91
Child support
720.00
720.00
960.00
1,200.00
One-half cost of Sea Nymph
182.03
One-half cost of boat motor
and trailer
145.98
Interest - 45 Credit Union
290.83
69.46
435.49
Interest - Society
609.96
609.96
1,078.11
Sales tax - 1974 Honda
13.46
Sales tax - 1971 Pontiac
49.50
Dentist Fee
52.00
156.00
City and state taxes
25.51
100.63
161.98
291.22
Union Dues
32.99
133.06
140.24
169.16
Gasoline tax
103.00
116.00
116.00
Gifts and allowances
11,171.00
22,410.00
885.00
May Company purchases
66.88
Sales tax - 1975 Honda
26.50
Sales tax - 1976 Cadillac
525.25
Tax return preparation
5.00
5.00
Contributions
5.00
Home insurance
151.00
162.00
Gas installation
182.40
Television antenna
205.62
Cash payments to ex-wife
10,000.00
Attorneys fees
650.00
500.00
Mortgage interest
691.11
1,472.36
Real estate taxes
565.99
1,139.70
Sales tax - 1976 Chevy Van
495.00
Sales tax - 1972 Corvette
297.00
Vacuum cleaner
379.27
Airline ticket
340.00
Home repairs
774.85
Total Personal living expenses
$7,159.85
$16,762.87
$42,346.69
$12,168.85
*221 Respondent determined that petitioner made the following gifts during the years indicated: Gifts and allowances:
1975
1976
1977
Cash gifts to JoAnn Baker
$ 171.00
$ 660.00
Cash gifts to
Nathaniel Daniel
300.00
Cash gift to John McLeod
150.00
Cash gifts to and asset
acquisitions for
Dessie Washington: 5/13/75, checking
account deposit
5,000.00
5/13/75, savings
account deposit
5,000.00
6/28/75, checking
account deposit
1,000.00
7/30/76, savings
account deposit
5,000.00
Swimming pool
6,300.00
Down payment on
dry cleaners
10,000.00
Cash gifts to Carol Harmon
885.00
Total Gifts and allowances:
$11,171.00
$22,410.00
$885.00
Respondent determined the following adjustments in petitioner's income for the years indicated: Adjustments:
1974
1975
1976
1977
Sick Pay
$ (3,456.00)
$ (704.00)
$ (792.00)
Gift of 1974 LTD to Dessie
4,033.35 Loss on trade-in of Pinto
1,249.28 Income tax refunds
(126.97)
(308.65)
(255.33)
(150.00)
One-half payments made to
petitioner on motor home
(1,139.76)
(1,139.76)
(189.96)
Gift of 1974 Cadillac
to daughter
7,280.00 Tax rebate
(61.00)
Loss on 1974 Honda
124.00 Furniture refunds
(142.20)
Loss on sale of 1976 Cadillac
765.00 Loss on sale of motor home
3,000.00 Loss on sale of 1971 Pontiac
700.00 Purchase of 1977 Thunderbird
7,030.91 Purchase of 1977 Ford LTD
for Dessie
6,650.35 Purchase of 1977 Ford LTD
for Ben Keys, Jr.
5,775.35 Total Adjustments
$ 559.00 $5,190.59 $3,877.51 $18,514.61 *222 The understatement of petitioner's income alleged by respondent was computed in the following manner: COMPUTATION OF UNDERSTATEMENT
1973
1974
1975
1976
1977
Net worth
$8,765.86
$18,587.08
$20,272.83
$ 86,302.90
$106,846.52
Net worth at
beginning of year
8,756.86
18,587.08
20,272.83
86,302.90
Increase in net worth
9,821.22
1,685.75
66,030.07
20,543.62
Adjustments
559.90
5,190.59
3,877.51
18,514.61
Personal living
expenses (including
gifts and allowances)
7,159.85
16,762.87
42,346.69
12,168.85
Adjusted gross income
as corrected
17,540.97
23.639.21
112,254.27
51,227.08
Adjusted gross income
as reported
2,486.41
5,424.14
8,116.00
13,351.24
Understatement of
adjusted gross income
$15,054.56
$18,215.07
$104,138.27
$37,875.84
OPINION Petitioner contests respondent's determination that he understated his income for each year, 1974 through 1977, on two grounds. First, petitioner contends that he saved during prior years a total of $68,000.00 in cash, which he kept in a safe in the basement of his apartment at 1696 East 79th Street. He states that these cash savings were used to finance *223 the purchase of his house at 3665 Brinkmore Road, the purchase of furniture and appliances for the house and the acquisition of other assets. Second, petitioner denies contributing any money toward the purchase of those assets held in others' names that were attributed to him by respondent. These include cash gifts to his mother in Alabama used to purchase a house, swimming pool and dry cleaners; gifts of automobiles to his mother and stepfather; and, assets purchased in the name of nominees. Instead, petitioner alleges the purchases were made by other parties, who each possessed cash hoards of their own. Respondent contends that petitioner's "cash hoard" and the cash hoards of his relatives did not exist and, instead, that petitioner earned substantial amounts of income through the sale of marijuana. Respondent argues that petitioner attempted to conceal his acquisition of certain assets by placing such assets in the name of nominees, and attempted to impede respondent's investigation of petitioner by giving false statements to respondent's agents. Respondent calculated petitioner's income by the net worth method of reconstructing income. The net worth method is used to reconstruct *224 a taxpayer's income where, as here, the taxpayer fails to keep any books or records. Holland v. United States,348 U.S. 121 (1954). The net worth method measures income by calculating the difference between the taxpayer's net worth at the opening and the closing of a given taxable year. Therefore, an essential element of this method is the opening net worth of the taxpayer.[4]Holland v. United States,supra.Respondent is required to investigate leads provided by taxpayer reasonably susceptible of being checked, which would establish likely sources of nontaxable income. Holland v. United States,supra;Friedman v. Commissioner,421 F.2d 658 (6th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court. Petitioner, however, bears the burden of proving that respondent's determination of petitioner's income is incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). *225 Respondent has properly applied the net worth method of reconstructing petitioner's income in these cases. Petitioner kept no books or records from which his income could be accurately determined. Respondent has documented fully all assets, liabilities and expenditures of petitioner which were used in respondent's determination. Respondent's agent pursued all leads provided by petitioner with respect to petitioner's claim that he had significant sources of nontaxable income, by interviewing petitioner's mother, brother, daughter, ex-wife, various personal friends of petitioner and salesmen with whom petitioner transacted business in acquiring assets that he placed in the names of nominees or that were given to relatives. We find respondent's calculations, set forth in the Findings of Fact, reflect accurately the assets, liabilities and expenditures of petitioner during the years at issue in these cases. We find that petitioner's claims that he (1) had a cash hoard of $68,000.00 stored in a safe in the basement of 1696 East 79th Street and (2) owned no interest in the various assets that we find were purchased in the name of certain nominees to be wholly without merit. Petitioner *226 contends that he had accumulated savings of $68,000.00 from 1958 through 1976 by saving $50.00 per week for approximately 13 of the 18 years and $100.00 per week for the remaining five years. His principal sources of income were the National Casting Company and Fisher Body. Petitioner claims he earned supplemental income during these years by painting apartments and by renting vacant rooms at 1696 East 79th Street, where he was a custodian, to prostitutes. Two witnesses testified to support petitioner's claim of earning supplemental income, both of whom knew petitioner only during the early to mid-1960's. Other than his uncorroborated testimony, which we believe lacked candor, the record does not support petitioner's contention that he ever earned any significant supplemental income from painting apartments or any income from renting rooms to prostitutes. We believe that petitioner did earn supplemental income from painting apartments, but not enough to support a finding that he had a cash hoard in any amount. We conclude that petitioner had no cash savings at the beginning of 1974 other than the amount determined by respondent as set forth in the Findings of Fact. Petitioner's *227 testimony about his alleged cash hoard is fraught with inconsistency. For example, petitioner alleges that in 1975 he was saving $100.00 per week which he was able to do because he could live rent-free in the building in which he was custodian. His net earnings from his employment at Fisher Body in 1975, however, were only $4,686.73. Further, petitioner testified that he would have reported any other income on his Federal income tax return. The only source of income reported on his 1975 return was Fisher Body. Therefore, we conclude petitioner had no supplemental sources of income in 1975, and that petitioner did not accumulate any cash savings from reported income that year. Similarly, we note that petitioner's returns for the years 1970 through 1974 and 1976, 1977 report no more than minimal amounts of supplemental income (strike benefits, interest, dividends or rent). We find that petitioner did not accumulate any cash savings from reported income during any of those years. Petitioner claims that he kept his cash hoard in a heavy metal combination safe, which he stored in a coal bin in the basement of 1696 East 79th Street. Again, only petitioner's own uncorroborated testimony *228 supports a finding that the cash or the safe existed. Petitioner testified that the safe remained in the coal bin of the basement of 1696 East 79th after petitioner moved to the house on Brinkmore Road in 1976, despite the fact that petitioner estimated that he left $20,000.00 in the safe. It is inconceivable that petitioner, who claims to have saved $100.00 per week, would leave $20,000.00 in the basement of a building in what petitioner himself described as a "rough area" after moving to a different part of town. Further, the building was condemned by the city in 1977 and later demolished (and with it any safe). As noted, petitioner testified that approximately $20,000.00 of his $68,000.00 in cash savings remained at the end of 1976. The record indicates, however, that petitioner's expenditures in 1976 included the following: Down payment on 3665 Brinkmore
$30,000.00
Furniture and appliances
31,390.47
1976 Corvette
5,408.50
Total:
$66,798.97
At the same time, petitioner's cash assets held in bank accounts increased by $3,951.09. Petitioner's expenditures in 1976 alone exceeded his alleged accumulated cash hoard plus his income from Fisher Body, *229 and petitioner could not explain how to reconcile this fact with his testimony that he still had $20,000.00 cash at the end of 1976. Petitioner had no sources of nontaxable income to account for his increases in net worth during each of the years at issue in these cases. Petitioner's second argument is that he contributed no money toward the purchase of (1) the dry cleaners operated by his brother J.L., (2) his mother's new house in Ozark, Alabama, (3) the swimming pool installed at that house, or (4) the two 1977 Ford LTD's purchased in 1977. Instead, petitioner theorizes that Dessie paid for portions of these items out of an alleged savings of approximately $25,000.00 from her earnings as a housekeeper. The balance was supposedly paid by J.L., petitioner's brother, who allegedly kept large sums of cash in a tool box in a hole behind the trim above the bathroom door. Petitioner's theory is without basis in fact. In 1977, the only year in which Dessie earned income on which she was required to pay taxes, Dessie filed a Federal income tax return in which she reported wages of $2,584.40 and rental income of $1,200.00. Dessie testified at trial that she kept her cash savings *230 (perhaps $27,000 she said) in her girdle, in her bosom (perhaps $5,000 she said), and in a ceder chest in her house (whenever the wads in her girdle and bosom grew too large for comfort). These cash savings were supposedly used to pay for a portion of the $3,950.00 down payment on her house, a portion of the $15,000 purchase price for the dry cleaners and the 1977 Ford LTD purchased for her by petitioner in 1977. We are unable to accord Dessie's testimony any weight. Her testimony was inconsistent as to the amounts of her savings, where the savings were kept, and how they were applied. We do not believe that Dessie could have saved the amounts claimed by her; and further, we believe that her testimony that she accumulated thousands of dollars in her bosom and her girdle bordered on perjury, being contrary in many important respects to her testimony before the grand jury that indicted petitioner. Substantial cash deposits to Dessie's accounts were made in 1975, the year in which her house was purchased and in 1976, the year in which the dry cleaners was purchased. We find these deposits came from petitioner and not from Dessie's girdle, bosom or cedar chest. Petitioner had told *231 the real estate agent that "he wanted to buy a home for his mother"; petitioner's name appears on the title to the house. Therefore, we find that respondent properly attributed the amounts expended on behalf of Dessie's home, the dry cleaners and her 1977 LTD to petitioner. See Friedman v. Commissioner,421 F.2d 658 (6th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court. Similarly, J.L. testified about his own cash savings purportedly used for his mother's swimming pool, a portion of the purchase price of the dry cleaners, a portion of the down payment on his mother's house and partial payment of the two 1977 Ford LTD's purchased by petitioner in 1977 and a 1974 Ford LTD purchased by petitioner in 1974. We find J.L.'s testimony to be inconsistent, incredible and otherwise unsupported by the record. Most importantly, J.L.'s testimony is in direct conflict with his earlier testimony before the grand jury that indicted petitioner. His testimony on the income from which his savings were derived and the location of the cash savings also is contrary to his previous grand jury testimony. We conclude that J.L. did not contribute any funds to purchase *232 those assets attributed to petitioner by respondent, and that the funds used to purchase the swimming pool, Dessie's home, the dry cleaners and the three LTD's came from petitioner. See Friedman v. Commissioner,supra.
Having negated all possible sources of nontaxable income and having pursued all leads in that regard, respondent need not establish a likely source of petitioner's income. United States v. Massie,355 U.S. 595 (1958); Foster v. Commissioner,487 F.2d 902 (6th Cir. 1973), affg. per curiam a Memorandum Opinion of this Court. Respondent's calculations of petitioner's net worth are well supported by the record. Petitioner has failed to suggest any sources of nontaxable income that respondent disregarded. We hold that petitioner earned taxable income for the years 1974, 1975, 1976 and 1977 and failed to report income for those years in the amounts determined by respondent and set forth in our Findings of Fact. The remaining issue is whether petitioner's underpayment of income tax was due to fraud. Respondent must establish by clear and convincing evidence that there was an underpayment of tax and that some part *233 of the underpayment was due to fraud within the meaning of section 6653(b).[5]Rule 142(b), Tax Court Rules of Practice and Procedure; section 7454(a). Consistent underreporting of income that is substantial in amount is indicative of fraudulent intent. Foster v. Commissioner,487 F.2d 902 (9th Cir. 1973), affg. per curiam a Memorandum Opinion of this Court; Stone v. Commissioner,56 T.C. 213 (1971); Otsuki v. Commissioner,53 T.C. 96 (1969). Concealment or deception by the taxpayer also supports a finding of fraud within the meaning of section 6653(b). Spies v. United States,317 U.S. 492 (1943); Zell v. Commissioner,763 F.2d 1139 (10th Cir. 1985). Respondent has established the existence of fraud for each of the years at issue in these cases by clear and convincing evidence. [6]
*234 As discussed above, an underpayment of tax exists for each of petitioner's taxable years 1974, 1975, 1976 and 1977. Abundant evidence in the record establishes clearly and convincingly that petitioner's underpayments of tax for each of the years at issue herein were due to fraud within the meaning of section 6653(b). Petitioner consistently underreported his income in substantial amounts and actively attempted to conceal those amounts from respondent. Petitioner attempted to hide his acquisition of certain assets by placing them in the name of nominees. Charles King was one such nominee, in whose name petitioner acquired a 1976 Chevrolet van and the property at 1655 East 79th Street. Linda Shipman was another nominee in whose name petitioner acquired a 1977 Thunderbird. Petitioner provided all funds for these assets and received no consideration from the nominee. Petitioner made false statements to respondent's agent in July of 1977 regarding petitioner's ownership of these assets. Petitioner denied owning the 1976 Chevrolet van or the 1977 Thunderbird both of which sat in his driveway when respondent's agent interviewed him and asked whether petitioner owned them. We conclude *235 that petitioner deliberately attempted to mislead respondent's agents. The evidence establishes that petitioner consistently underreported his income, and that petitioner attempted to conceal the acquisition of various assets from respondent and made false statements to respondent's agents. Petitioner's underpayment of Federal income tax for each of the years 1974, 1975, 1976 and 1977 was due to fraud within the meaning of section 6653(b). Decisions will be entered for respondent.
Footnotes
1. Mr. Blackwell represented petitioner at trial. The petitioner filed no briefs in this case.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
*. Not in record.↩
3. Section 7201. ATTEMPT TO EVADE OR DEFEAT TAX. Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both, together with the costs of prosecution.↩
***. Return not in record.↩
4. The net worth method, as noted, measures income by calculating the difference between the opening and closing net worth of the taxpayer (the excess of the taxpayer's adjusted basis in his assets over his liabilities) for a given taxable year. The increase (or decrease) in net worth is adjusted by adding nondeductible expenditures -- e.g., personal living expenses, gifts and allowances -- and subtracting nontaxable income items received -- e.g., gifts, loans and cash savings. The result represents the income (or loss) attributed to the taxpayer for that year.↩
5. Section 6653(b) provides in pertinent part: (b) FRAUD. -- (1) In General.↩ -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * 6. Since petitioner pleaded guilty to the criminal tax fraud charge for the taxable year 1975, he is estopped from challenging the addition to tax for fraud with respect to that year. Gray v. Commissioner,708 F.2d 243↩ (6th Cir. 1983).